BEN VENUE LABORATORIES,
INC., Plaintiff,

v.

NOVARTIS PHARMACEUTICAL
CORPORATION, Defendant.

Novartis Corporation, Plaintiff,

v.

Ben Venue Laboratories,
Inc., Defendant.

No. CIV 99–2006 WGB.

United States District Court,
D. New Jersey.

May 30, 2001.

LeBoeuf, Lamb, Green & MacRae, L.L.P. by Frederick B. Lacey, Stuart Alderoty, Michael J. Feldman, Newark, NJ, Pennie & Edmonds, L.L.P. by Jonathan A. Marshall, Brian D. Coggio, F. Dominic Cerrito, New York City, for Defendant, Ben Venue Laboratories, Inc.

Drinker, Biddle & Shanley, L.L.P. by John J. Francis, Jr., Florham Park, NJ, Fitzpatrick, Cella, Harper & Scinto by Robert L. Baechtold, New York City, for Plaintiff, Novartis Pharmaceutical Corp.

## OPINION and ORDER

BASSLER, District Judge:

This matter arises out of Ben Venue Laboratories' quest to produce a generic version of the patented bone drug Aredia (R), in the face of vehement opposition by the patent holder, Novartis Pharmaceutical Corporation. The procedural history of this dispute is complex, and every issue that has come before the Court has been hard fought by the litigants. At an oral argument on February 14, 2000 it was brought to the Court's attention that it might lack subject matter jurisdiction over a particular segment of the litigation. The Court subsequently invited the parties to brief the issue.

After careful study of the submissions, the Court concludes that it **has subject matter jurisdiction** over the entirety of the infringement action, including Ben Venue's amended FDA Abbreviated New Drug Application. The Court reaches this conclusion after determining that its infringement analysis must examine the product Ben Venue intends to bring to market, not merely the contents of its Abbreviated New Drug Application at a particular point in time during the FDA's approval process.

Additionally, because it was permissible for Novartis to engage in discovery relevant to all aspects of Ben Venue's application to produce a generic version of Aredia, Ben Venue's motion for leave to seek sanctions against Novartis for its discovery practices in this matter is **denied.**

## I.  BACKGROUND

### 1.  *Procedural History*

The current action (98–cv–2006 (WGB)(the "2006 action")) involves U.S. Patent 4,711,880, entitled "Crystalline Disodium 3–Amino–1–Hydroxypropane–1, 1–Diphosphonate Pentahydrate" ("Pamidronate Disodium" or "Aredia"), held by Novartis Pharmaceutical Corp. ("Novartis"). The 2006 action was initiated on April 28, 1998 when Ben Venue Laboratories, Inc. brought a declaratory judgment suit against Novartis, challenging the validity of the '880 patent, and seeking to remove Novartis's listing for the '880 Patent from the Food and Drug Administration's "Orange Book." [1]

On May 8, 1998 Novartis commenced a separate patent infringement action against Ben Venue Pharmaceutical Corp. and Boehringer Ingelheim Corp.,[2] alleging that Ben Venue's Abbreviated New Drug Application ("ANDA") 75–290 (for a generic pamidronate disodium drug), infringed the '880 patent. That action (98–cv–2143 (JAG)) was consolidated with Ben Venue's 2006 action by order of the Court on May

---

1. The "Orange Book" is the comprehensive listing of all drug products approved for sale by the FDA. It is officially titled, *Approved Drug Products with Therapeutic Equivalence Evaluations.*

2. By consent of the parties, Boehringer Ingelheim Corp. was dismissed from this action on April 19, 1999.

19, 1998.[3]

The Court issued an opinion in the 2006 action on June 23, 1998, which concluded that the court had subject matter jurisdiction to consider the declaratory judgment action, and which denied Ben Venue's request for a preliminary injunction de-listing the '880 patent from the Orange Book. *Ben Venue Labs., Inc. v. Novartis Pharm. Corp.*, 10 F.Supp.2d 446 (D.N.J.1998).

Novartis commenced another patent infringement action against Ben Venue (99–cv–2336 (WGB)(the "2336 action")) on May 21, 1999, this time alleging that Ben Venue's NDA 21–113, which sought approval for a liquid version of Aredia, infringed the '880 patent. On February 18, 2000 Novartis commenced a third patent infringement action against Ben Venue (00–cv–769 (WGB)), alleging that a different dosage certification of NDA 21–113 also infringed the '880 patent. By order of the Court, 00–cv–769 was consolidated into the 2336 action on May 4, 2000.

The Court granted Ben Venue's motion for summary judgment of non-infringement in the 2336 action on September 29, 2000, and entered a final judgment on November 3, 2000 that NDA 21–113 does not infringe the '880 patent. Novartis appealed the Court's judgment to the United States Court of Appeals for the Federal Circuit on December 1, 2000. That appeal is still pending.

The Court's judgment in the 2336 action turned not on an interpretation of the '880 patent but instead on facts specific to NDA 21–113. Since the September 29, 2000 decision did not reach the validity of the '880 Patent, it had no legal impact on the 2006 action, which involves Ben Venue's factually distinct ANDA 75–290.

A number of issues still await the Court's attention in these matters. Since jurisdiction exists, the Court must consider Ben Venue's motion to bifurcate any eventual trial in the 2006 action, and its appeal of the Magistrate Judge's decision on a discovery matter. These motions had been stayed pending resolution of the jurisdictional issues. Additionally, regardless of the disposition of the 2006 action, the Court must address Ben Venue's post summary judgment motion in the 2336 action for Rule 11 sanctions against Novartis. Lastly, there exist a pair of motions to intervene for purposes of modifying the Court's protective order, brought by intervenor American Pharmaceutical Partners in both the 2006 and 2336 action.

This opinion addresses only the jurisdictional questions that have arisen in the 2006 action, and Ben Venue's request for the imposition of sanctions against Novartis. The other matters will be addressed in subsequent opinions.

### 2. *Ben Venue's ANDA 75–290*

This action involves Ben Venue's Abbreviated New Drug Application ("ANDA") 75–290, filed with the FDA on December 23, 1997. As originally filed, ANDA 75–290 sought permission to manufacture a generic version of Novartis's patented Aredia, specifically, "Pamidronate Disodium for Injection; 30 mg, 60 mg, and 90 mg per vials." (Ben Venue Paragraph IV Certification, Slater Decl., Exh. A). According to Ben Venue's certification, those three dosage formulations would all be manufactured using a bulk pamidronate disodium starting material. *Id.* The parties have referred to this manufacturing process as Ben Venue's "original formulation."

---

**3.** Ben Venue has agreed that Novartis will be Plaintiff at trial, so for purposes of this opinion, any references to Plaintiff are to Novartis and any references to Defendant are to Ben Venue.

As required by FDA regulations, Ben Venue provided Novartis with notice of its Paragraph IV Certification by letter dated March 21, 1998. (Slater Decl., Exh. C). That letter informed Novartis that "[t]he product for which applicant has sought approval from the FDA . . . is a lyophilized material, as opposed to the allegedly new and improved crystalline hydrate [claimed by the '880 patent]." *Id.* On May 8, 1998, within 45 days of its receipt of Ben Venue's notice letter, Novartis sued Ben Venue, alleging that the product sought to be manufactured by ANDA 75–290 would infringe the '880 patent.

On March 12, 1999 Ben Venue sent a letter to the FDA, seeking to amend ANDA 75–290:

> At this time, Bedford Laboratories would like to amend this application with a new formulation of Pamidronate Disodium for Injection. Bedford Laboratories is not withdrawing the formulation submitted in the original application, but would like to include with a formulation which will utilize Pamidronic Acid and Sodium Hydroxide to form the Pamidronate Disodium. This remains a lyophilized product. . . .

Ben Venue Letter to FDA, March 12, 1999, p. 4 (Slater Decl. Exh. D.). By facsimile dated August 19, 1999, the FDA informed Ben Venue that what it sought to do was not permissible:

> An additional formulation for the drug product was proposed. The proposed formulation uses Pamidronic Acid and Sodium Hydroxide to form the active ingredient, Pamidronate Disodium. Two formulations are not permitted in the same ANDA . . . This formulation and related documentation and data should be withdrawn and filed as a separate ANDA.

FDA Fax to Ben Venue, August 19, 1999, p. 1 (Second Slater Decl. Exh. 1). In response, Ben Venue informed the FDA:

> Bedford Laboratories would like to withdraw the earlier formulation in which sodium pamidronate is used as an active pharmaceutical ingredient (API) due to the fact that the API supplier has indicated that only pamidronic acid will be produced in the future. Additionally, during the manufacturing process, there is *in-situ* conversion of pamidronic acid to sodium pamidronate in an aqueous medium, hence the therapeutic moiety remains identical. Bedford Laboratories would like to keep the formulation in which Pamidronic acid is used as an active pharmaceutical ingredient instead of sodium pamidronate.

Ben Venue letter to FDA, September 16, 1999, p. 1 (Second Slater Decl. Exh. 1). Ben Venue's September 16 letter led to a teleconference with the FDA on September 28, 1999. That conversation was memorialized in another Ben Venue letter to the FDA:

> Per the telephone conversation, Ben Venue Laboratories is withdrawing the original formulation and also component and composition statement, which refers the use of pamidronate disodium to manufacture pamidronate disodium for injection. . . .

Ben Venue letter to FDA, November 16, 1999, p. 1 (Slater Decl., Exh. E).

In effect, after the November 16, 1999 amendment letter, ANDA 75–290 still contained a request to produce a lyophilized (or freeze dried) generic version of pamidronate disodium for injection in 30 mg, 60 mg, and 90 mg/per vials, but had been amended to seek approval for a manufacturing process that began with pamidronic acid, instead of ready-made pamidronate disodium. This new manufacturing pro-

cess has been referred to by the parties as the "new formulation."

It is undisputed that Ben Venue has not amended its Paragraph IV Certification to reflect the "new formulation," and to the best of the Court's knowledge the FDA has not ordered Ben Venue to do so. Novartis had notice of the amendment to ANDA 75–290 because Ben Venue's March 12, 1999 letter to the FDA was produced to Novartis's outside counsel on October 19, 1999. The November 16, 1999 letter actually amending ANDA 75–290 was produced to Novartis's outside counsel late in 1999.

On October 22, 1999 Novartis amended its complaint, to include a claim that, "[u]pon information and belief, Ben Venue's infringement of the '880 patent was and is willful." (Amended Complaint, ¶ 14).

## II. ANALYSIS

Both Defendant and Plaintiff now take the position that this Court lacks subject matter jurisdiction over any infringement by the "new formulation" presently contained in Ben Venue's ANDA 75–290. They have reached this conclusion based on Novartis's bald assertion, months after the commencement of discovery, that it had never "sued" Ben Venue on the "new formulation." For all of the reasons that follow, this Court is placed in the highly unusual position of having to disagree, and concludes that despite the parties' assertions, the Court has jurisdiction in this matter.[4] Unless the parties seek dismissal of the action pursuant to Fed.R.Civ.P. 41, the Court holds that litigation of this matter should proceed to the merits, as expeditiously as possible.

The Court's analysis begins after passing through Alice's proverbial looking-glass,[5] into the strange, fictive realm of patent infringement created by the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub.L.98–417)("The Hatch–Waxman Act"). The Hatch–Waxman act is codified by 35 U.S.C. § 271(e)(1), *et seq.* Generally, § 271(e)(1) creates a safe harbor for generic drug manufacturers, which "allows competitors, prior to the expiration of a patent, to engage in otherwise infringing activities necessary to obtain regulatory approval." *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 671, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990).

This safe harbor is not absolute. When a manufacturer such as Ben Venue applies for approval of a new generic drug,[6] it must also certify to the FDA as part of that application that for each patent listed in connection with the brand name drug:

(I) that such patent information has not been filed;

(II) that such patent has expired;

---

**4.** "If the jurisdiction of a federal court is questioned, the court has the power and the duty, subject to review, to determine the jurisdiction issue." 13A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, § 3536 (1984).

**5.** *See,* Lewis Carroll, *Through the Looking-Glass, and What Alice Found There* (1872).

**6.** A generic drug application submitted to the FDA is known as an Abbreviated New Drug Application ("ANDA"). Unlike the stringent requirements for a new drug application, an applicant under an ANDA need not show independent evidence of the safety and efficacy of its generic drug, but instead need only show that its drug is "bioequivalent" to the previously approved brand name drug. 21 U.S.C. § 355(j)(2)(A). This allows for expedited approval, since the generic manufacturer seeks only to market a generic version of an already approved drug. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1568 (Fed.Cir. 1997).

(III)the date on which such patent will expire; or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the generic drug.

21 U.S.C. § 355(j)(2)(A)(vii). An ANDA which makes the fourth certification (known as a "Paragraph IV Certification"), must provide notice to the owner of the patent and the holder of the approved NDA for the listed drug, stating that it has submitted an ANDA and including a "detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed." 21 U.S.C. § 355(j)(2)(B)(ii).

A Paragraph IV Certification has significant legal effects, most notably an abrogation of the safe harbor provisions of 35 U.S.C. § 271(e)(1). Specifically, the safe harbor is eliminated by 35 U.S.C. § 271(e)(2), which creates "a highly artificial act of infringement that consists of submitting an ANDA ... containing the fourth type of certification that is in error as to whether commercial manufacture, use or sale of the new drug (none of which, of course, has actually occurred) violates the relevant patent." *Medtronic*, 496 U.S. at 678, 110 S.Ct. 2683. In effect, the submission of a Paragraph IV Certification to the FDA is itself an artificial, purely notional act of patent infringement.

■■■ Since a United States District Court has exclusive jurisdiction to hear suits for patent infringement pursuant to 28 U.S.C. § 1338, the notional act of infringement created by 35 U.S.C. § 271(e)(2) creates a controversy over which the Court has subject matter jurisdiction. The parties contend that this jurisdiction is limited to only those elements of an ANDA which were addressed by the Paragraph IV Certification, and does not extend to any subsequent amendments to the ANDA. The Court disagrees, since such a narrow reading would undermine the purpose of 35 U.S.C. § 271(e)(2).

As a matter of procedure, from the receipt of notice stating that an ANDA containing a Paragraph IV Certification has been filed with the FDA, a patent holder has 45 days to determine whether it wishes to commence suit against the generic applicant. If, within 45 days of receiving notice, the patent owner sues the ANDA filer for patent infringement, the ANDA approval is essentially stayed for 30 months:

> If the [ANDA] applicant made a [Paragraph IV Certification], the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice ... is received. If such action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of notice....

21 U.S.C. § 355(j)(5)(B)(iii). This 30–month stay is to allow the patent infringement action to be litigated in court, and to give assurances to innovator companies that generic manufacturers will not immediately proceed to market after receiving approval of their ANDA's. *See, Proposed FDA Rules*, 21 C.F.R. Part 314, 64 F.R. 42873, 42881 (August 8, 1999).

Here, Novartis sued Ben Venue after receiving notice on March 21, 1999 that ANDA 75–290 contained a Paragraph IV Certification directed to the '880 patent. The receipt of that notice triggered a 30–month statutory stay, which expired on September 21, 2000. Novartis is now seemingly content to "dismiss" the "new formulation" without prejudice, claiming it

never "sued" Ben Venue on that formulation. Novartis apparently believes that FDA approval of ANDA 75–290 will not be possible until Ben Venue provides the FDA with a new Paragraph IV Certification. It is likely that Novartis's sole intention in this regard is to obtain a fresh 30–month stay as to the "new formulation," thus further delaying the entry of the product covered by ANDA 75–290 into the drug market.

Ben Venue also contends that the Court lacks jurisdiction over the new formulation, arguing that it has never been sued by Novartis on the new formulation, despite Novartis's extensive discovery efforts into the new formulation. Ben Venue contends that Novartis knew its discovery was premature, and as a result Ben Venue seeks attorneys fees for discovery and associated litigation costs. Ben Venue repeatedly asserts that it will "not advocate suit against itself" by filing an additional paragraph IV Certification that the FDA has not required it to file. Ben Venue seemingly hopes to have the Court dismiss Novartis's infringement action,· clearing the way to FDA approval of the new formulation.[7]

■ It is important to remember that the purpose of the 30–month stay is not necessarily to extend the patent holder's monopoly, but to create an adequate window of time during which to litigate the question of whether a generic will infringe the patented product, without actually having to introduce the generic product to the market. *See, generally,* 130 Cong. Rec. H9118 (daily ed. Sept. 6, 1984)(statement of Rep. Waxman); 130 Cong. Rec. S10504 (daily ed. Aug. 10, 1984)(statement of Sen. Hatch).

■ During that 30–month period, "section 271(e)(2)(A) makes it possible for a patent owner to have the court determine whether, if a particular drug *were* put on the market, it *would* infringe the relevant patent." *Bristol–Myers Squibb Co. v. Royce Labs., Inc.,* 69 F.3d 1130, 1135 (Fed. Cir.1995). During this period, the statute requires that an infringement inquiry be focused on what is likely to be sold following FDA approval, not necessarily on the ANDA itself. *Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1568 (Fed.Cir.1997).

■ In this infringement litigation, the Court looks not just to the specifics of the ANDA as originally filed, but to all of the facts before it which may aid in its determination of whether the product described in the ANDA will infringe when it is finally brought to market. *See Bayer AG v. Elan Pharm. Research Corp.,* 212 F.3d 1241, 1246–47 (Fed.Cir.2000). Ultimately, "[t]he relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product. What is likely to be sold, or, preferably, what

---

7. Ben Venue informed the Court by letter on May 2, 2001 that on April 30, 2001 the FDA granted final marketing approval to Ben Venue for ANDA 75–290. Since 21 U.S.C. § 355(c)(3) provides that the FDA may grant such approval after the expiration of the 30–month period (absent order of the Court), the FDA decision was permissible. Contrary to Ben Venue's assertion in its May 2 letter that "this 'artificial act of infringement' suit has outlived its usefulness," just because market-. ing approval has been given does not mean Novartis's right to pursue this infringement litigation has been abrogated (nor has Ben Venue's right to challenge the validity of the '880 patent been abrogated). Should Ben Venue proceed to market its product, the Court's analysis would merely shift from an analysis of whether ANDA 75–290 *would* infringe *if* marketed, to an analysis of whether the drug covered by ANDA 75–290 actually infringes as manufactured or sold. Additionally, since Novartis's action includes a claim for wilful infringement, it may still recoup its attorneys fees for the cost of this litigation, should it prevail on the infringement issue.

will be sold, will ultimately determine whether infringement exists." *Glaxo,* 110 F.3d at 1570.

So that examination of a product's ultimate infringement may commence, " § 271(e)(2) provides patentees with a defined act of infringement sufficient to create case or controversy jurisdiction to enable a court to promptly resolve *any dispute* concerning infringement and validity." *Glaxo,* 110 F.3d at 1569 (Emphasis added). Based on this language, the Court concludes that once a Paragraph IV Certification has been filed, notice given, and suit commenced, it may examine any materials which aid in its analysis of whether the final product to be marketed (in this case, lyophilized pamidronate disodium for injection) will infringe. By necessity, this includes any post-certification amendments to an ANDA.

The Federal Circuit has approved district courts' infringement inquiries that looked to matters not included in the original Paragraph IV Certification. In *Glaxo,* the Federal Circuit noted that a district court's inquiry is "properly grounded in the ANDA application and the extensive materials typically submitted in its support." 110 F.3d at 1569. As part of this inquiry, a court must look to the final product to be sold, even if the product originally applied for differs somewhat from that ultimately approved. *See e.g., Glaxo,* 110 F.3d at 1569.

In *Bayer,* the district court's infringement analysis turned on facts included in an ANDA amendment made after the applicant's Paragraph IV Certification, and after litigation had commenced. 212 F.3d at 1246–47. Citing to *Glaxo,* the Federal Circuit noted that while the filing of an ANDA (with a Paragraph IV Certification) is considered an act of infringement, "this 'act' is merely a vehicle 'to create case or controversy jurisdiction to enable a court to promptly resolve' a dispute concerning an infringement that will happen in the future." *Bayer,* 212 F.3d at 1249, *citing Glaxo v. Novopharm,* 110 F.3d at 1569.

■ That a court may consider material changes made to an ANDA after litigation has commenced is also supported by *Biovail Corp. Int'l. v. Andrx Pharm., Inc.,* 239 F.3d 1297 (Fed.Cir.2001). In *Biovail,* the Federal Circuit noted:

Under 21 U.S.C. § 355(j)(2)(B), there is an obligation to disclose the filing of an ANDA, as well as its content, to the patent holder and other interested parties. *See* 21 C.F.R. 314.95 (2000). The obligation to inform the parties, and the trial court, as to any material amendment to the ANDA continues throughout the litigation that is artificially provoked under Paragraph IV.

239 F.3d at 1304. The Court concludes from this language that once the initial Paragraph IV Certification has been filed and litigation commences, a material change to an ANDA triggers a duty on the part of the ANDA filer to inform the patentee of the material change to the ANDA, but does not necessarily trigger a duty to file a new Paragraph IV Certification.

■ While Ben Venue did not inform Novartis directly of the material amendment to its ANDA, it did inform Novartis's outside counsel in a timely matter. Since litigation was on-going at the time of the amendment and discovery had commenced, the Court concludes that in light of the *Biovail* decision such notice was adequate.

Unlike *Biovail,* where material ANDA amendments triggered only a duty to provide notice to the patent holder, in other circumstances the FDA will require an applicant to amend their ANDA to include

a new Paragraph IV Certification.[8] For example, when an applicant seeks to amend their ANDA to include a new dosage formulation, the FDA will require that a supplemental Paragraph IV Certification be filed with the agency and appropriate notice given the patentee. The new Paragraph IV Certification can then provide the basis for a new infringement suit.

■ Such a chain of events existed in the 2336 action, where Ben Venue amended its NDA 21–113 to include a new dosage, filed a new Paragraph IV Certification, and was sued by Novartis. While Novartis points to this as support for the proposition that a new Paragraph IV Certification should have been filed for ANDA 75–290, the Court concludes that factual circumstances are sufficiently distinct here from those in the 2336 action as to render the re-certification requirement for new dosage formulations inapplicable.

An ANDA filer must provide a Paragraph IV Certification for multiple dosage formulations at least in part because all of those formulations will eventually proceed to market, and substantial technical differences may exist between them that require independent patent infringement actions:

> FDA's current regulations treat each strength of a drug product as a separate listed drug ... FDA recognizes that different strengths of the same drug product in the same dosage form may be formulated differently ... [and] may provide separate and distinct bases for patent challenges. Consequently, the

result of patent infringement litigation related to one strength of a particular drug product may not be applicable to another strength of the same drug product, even for the same ANDA applicant.

*Proposed FDA Rules,* 21 C.F.R. Part 314, 64 FR 42873, 42882 (August 6, 1999).

While ANDA 75–290 does contains three distinct dosages which are proceeding to market, all of them were expressly covered by Ben Venue's initial Paragraph IV Certification. Had Ben Venue subsequently amended ANDA 75–290 to include a fourth dosage formulation (like it did with NDA 21–113, in the 2336 action), the FDA would have required it to file a second Paragraph IV Certification as to that dosage formulation, and Novartis could have commenced a separate infringement suit.

Ben Venue sought via its amendment not to bring two distinctly formulated drug products to market, but instead to list two processes for the manufacture of the same drug product. As the FDA informed Ben Venue in its August 19, 1999 correspondence, FDA regulations prohibited the listing of two manufacturing processes for the same drug product in the same ANDA. Instead, the FDA permitted Ben Venue to abandon the original manufacturing process, and proceed with the new, amended process. Since permission for the substitution was granted, the Court infers that FDA regulations do not prohibit the substitution of one process for another in the same ANDA. After allowing the substitu-

---

8. Novartis has submitted to the Court an open letter from the FDA to all NDA and ANDA holders and applicants, dated October 31, 1986. (Slater Decl., Exh. G). In that letter, the FDA indicates that an ANDA filer who makes 1) formulation changes, 2) changes in conditions of use, or 3) strength changes should file a supplemental Paragraph IV Certification. Since Ben Venue has made a "formulation change," Novartis argues that it

should have been required to supplement its Certification. Upon review of the entire FDA letter, the Court concludes that the FDA was referring to changes in the formulation of the final drug product, not to changes in the manufacture or starting compound. Changes in manufacture/starting material fit more naturally with the holding in *Biovail,* where the patentee need only be given notice of amendments after they are made.

tion, the FDA did not require Ben Venue to file a new Paragraph IV Certification.

■ *Why* the FDA failed to require Ben Venue to file a new Paragraph IV Certification is irrelevant to this Court's analysis.[9] "Once it is clear that a party seeking approval of an ANDA wants to market a patented drug prior to the expiration of the patent, the patent owner can seek to prevent approval of the ANDA by bringing a patent infringement suit." *Bristol– Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130 (Fed.Cir.1995). The Federal Circuit's statement in *Bristol–Myers* articulates in plain language that while the Paragraph IV Certification provides the legal trigger for an infringement action, the inquiry truly begins because the ANDA filer seeks approval to market a patented drug prior to the expiration of the relevant patent.

It is possible that such a legal inquiry could begin even if the ANDA included no Paragraph IV Certification at all, so long as a Paragraph IV Certification should have been included. *See, Marion Merrell Dow, Inc. v. Hoechst–Roussel Pharm., Inc.*, 32 U.S.P.Q.2d 1156 (D.N.J.1994); *Abbott Labs. v. Zenith Labs., Inc.*, 934 F.Supp. 925 (N.D.Ill.1995). In *Abbott*, the court commented:

> 'The proper inquiry is, should the certification have included the patent and if so, is there an infringement of the patent?' If the ANDA applicant does not certify a properly listed patent, then the patent holder still has a cause of action under § 271(e)(2)(A).

934 F.Supp. at 936, *quoting Marion Merrell Dow*, 32 U.S.P.Q.2d at 1158. Since the patent holder had its patent on file in the Orange Book at the time the relevant ANDA was filed, it was immaterial for litigation purposes whether the patent was certified in the ANDA. *Id.*

Although the Federal Circuit has yet to speak to this proposition, this conclusion is reasonable. Since the certification provisions exist for the benefit of the patentee, a court could conclude that a patentee should be allowed to sue for infringement as soon as the ANDA filer has left the safe harbor of § 271(e)(1) by filing a potentially infringing ANDA with the FDA, even if the artful drafting of the ANDA attempts to circumvent the required filing of a Paragraph IV Certification.

Here, Ben Venue still seeks to market a version of Novartis's patented Aredia, as it did on December 23, 1997 when ANDA 75–290 was first filed, and still seeks to market this product prior to the expiration of the '880 patent. To that end, Ben Venue filed its original Paragraph IV Certification, so that it could bring ANDA 75-290 to market prior to the expiration of the '880 patent. As a grounds for permission, Ben Venue stated that ANDA 75–290 would not be infringing because "[t]he product for which applicant has sought approval from the FDA ... is a lyophilized material, as opposed to the allegedly new and improved crystalline hydrate [claimed by the '880 patent]." (Ben Venue Para. IV Cert.).

Ben Venue's September 16, 1999 correspondence to the FDA demonstrates that Ben Venue still seeks permission to market a lyophilized material, as opposed to the allegedly new and improved crystalline hydrate claimed by the '880 patent. In fact, the only change to the ANDA is that

---

9. The Court notes (without deciding) that the most logical reason for the FDA's action is that since Ben Venue was proceeding forward with the same generic drug product (with the same dosages, active ingredient, and method of administration, under the same ANDA number) a new Paragraph IV Certification was not required for Ben Venue to remain in compliance with the filing requirements of 21 C.F.R. § 314.95.

the pamidronate disodium which is eventually lyophilized will now be manufactured by Ben Venue *in situ,* versus purchased bulk from a supplier. Even though this manufacturing change will add a step to the Court's infringement analysis (potential infringement of the '880 patent by the creation of pamidronate disodium *in situ* ) that step is a logical extension of the original action, which must look to whether the product to be manufactured prior to the expiration of the '880 patent (lyophilized pamidronate disodium for injection) will infringe.

It must be pointed out that, while conduct cannot create jurisdiction where none exists, the Parties' prior conduct belies their current assertion that the Court lacks subject matter jurisdiction in this case. For a period of several months, Novartis engaged in discovery directed to the amended ANDA, and Ben Venue began to provide that discovery. If Novartis had reasonably believed that the safe harbor provisions still rendered the "new formulation" untouchable in an infringement action, why would it have engaged in discovery, or amended its complaint? If Ben Venue believed the Court's jurisdiction was lacking or that it was somehow protected by the safe harbor, why did it not file a motion to dismiss as soon as the Amended Complaint was filed, or seek to block discovery directed to a matter allegedly not before the Court?

The Court also finds Novartis's contention that it has not "sued" Ben Venue to be rather curious. An examination of the four-corners of Novartis's October 22, 1999 Amended Complaint reveal a pleading as applicable to the new formulation as to the old. The relevant portion of the Amended Complaint states:

> Ben Venue has filed [ANDA 75–290], and has, in connection with that ANDA, filed a [Paragraph IV Certification] with respect to the '880 patent ... seeking approval to sell pamidronate disodium for injection in 30 mg, 60 mg and 90 mg vials for inhibition of bone resorption by intravenous administration....

> Upon information and belief, the product for which Ben Venue seeks approval is or contains a lyophilized pamidronate disodium crystalline hydrate [or pentahydrate], and will be manufactured ... using a pamidronate disodium crystalline hydrate [or pentahydrate].

Amended Complaint, ¶¶ 8–10. Since Ben Venue still seeks to sell pamidronate disodium for injection in 30 mg, 60 mg and 90 mg vials for inhibition of bone resorption by intravenous administration, the only possible impact of the "new formulation" is that the "manufactured ... using" language might no longer be applicable to a product made using pamidronic acid, which is not claimed by the '880 patent. That having been said, Ben Venue's end drug product is still manufactured using pamidronate disodium, albeit pamidronate disodium manufactured *in situ.* If Novartis's only contention was that Ben Venue's bulk pamidronate disodium starting material infringed the '880 patent, then the Court questions why Novartis did not voluntarily dismiss this litigation as soon as Ben Venue announced it was no longer proceeding to market with that starting material, since the purpose of a § 271(e)(2) action is to prevent an infringing product from reaching the market.

The Court concludes that the filing of Ben Venue's original Paragraph IV Certification constituted an act sufficient to trigger an action for patent infringement over which this Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1338. Because as a matter of law the analysis in that infringement action must examine not just the product covered by ANDA 75–290's original certification but the product

that Ben Venue now seeks to market, the Court must necessarily consider the "new formulation." Since Novartis (via its outside counsel) had notice of the amendment to the ANDA, the primary purpose of the Hatch–Waxman Act's certification provisions (notice to the patentee sufficient to allow pre-marketing litigation) was satisfied. As a result, the Hatch Waxman Act will not be contravened by the Court's conclusion that it has subject matter jurisdiction over the entire matter, by virtue of Ben Venue's initial Paragraph IV Certification.

■ Any other conclusion would permit Ben Venue to perform an end-run around the provisions of the Hatch–Waxman Act. As Novartis correctly notes, if the Court were to conclude that it lacked jurisdiction over Ben Venue's amended ANDA, in the future a generic drug applicant could initially file an ANDA that included a non-infringing production process, and provide the patent holder with notice of their then-correct Paragraph IV Certification. The patent holder would (presumably) not sue on a compound that did not infringe, thus not triggering the 30 month statutory injunction. The generic drug applicant could then amend its ANDA, withdraw the original non-infringing process, and replace it with one that infringes. Unless the FDA compelled the generic manufacturer to file a new Paragraph IV Certification, the infringing product now covered by the ANDA could be immediately approved by the FDA and

proceed to market, after 45 days instead of 30 months.[10]

While the patent holder could commence a traditional patent infringement action as soon as the generic company began to manufacture their product, the generic company would have received all of the benefits of the Hatch–Waxman Act (development of the product for approval free from suit), without having suffered its detriments (litigation of infringement prior to the introduction of a competing product to the marketplace). The Court refuses to create such a large loophole in the applicable regulations and case law absent any clear precedent to the contrary.

■ Finally, the court **denies** Ben Venue's requests for leave to seek sanctions against Novartis for the discovery entered into regarding the "new formulation." Since that formulation was a component of the product-in-suit, Novartis was and is entitled to seek information regarding it.

Further, the Court will not allow either party to seek sanctions against the other for the delay and expense associated with the resolution of this jurisdictional question. While the Court questions Novartis's motives for raising the jurisdictional issue in the first place, it is apparent to the Court that the parties were equally culpable in actively obfuscating the issue once it was raised.

## III. CONCLUSION

For the foregoing reasons, the Court will not dismiss any portion of this action

---

**10.** Novartis has argued that the FDA should have required Ben Venue to file a new Paragraph IV Certification in this case, which would have triggered a new 30–month injunction, and subjected Ben Venue to a suit on its amended ANDA. Novartis further argues that this failure constituted a violation by the FDA of its own regulations, and that the Court should have compelled the FDA to order Ben

Venue to file the certification, or in the alternative compelled Ben Venue directly to file the certification. Since the FDA is not a party to this suit, the Court lacks any jurisdiction over it. Further, this Court doubts it has the authority to compel Ben Venue to engage in conduct which is designed solely to subject itself to suit.

for lack of subject matter jurisdiction. Ben Venue's request for leave to seek sanctions against Novartis is **denied.**

**So Ordered.**