DR. REDDY'S LABORATORIES, INC., and Dr. Reddy'S Laboratories Ltd., Plaintiffs,

v.

Tommy G. THOMPSON, as Secretary of United States Department of Health and Human Services; Lester Crawford, as Acting Principal Deputy Commissioner of Food and Drugs, United States Food and Drug Administration; United States Food and Drug Administration; and Andrx Pharmaceuticals, Inc., Defendants,

v.

Genpharm, Inc., Intervenor–Defendant.

Civil No. 02–452(WGB).

United States District Court, D. New Jersey.

Sept. 15, 2003.

Budd, Larner, Rosenbaum, Greenberg & Sade, P.C., by Andrew J. Miller, Esq., Brian T. Moriarty, Esq., Vijayant Pawar, Esq., Short Hills, NJ, for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, Christopher J. Christie, United States Attorney, by Susan Cassell, Asst. U.S. Attorney, United States Attorney's Office, Newark, NJ, Andrew E. Clark, Esq., Office of Consumer Litigation, U.S. Department of Justice, Washington, DC, Daniel E. Troy, Chief Counsel, Karen E. Schifter, Assoc. Chief Counsel, U.S. Food and Drug Administration, Rockville, MD, for the Government Defendants.

Proskauer Rose LLP, by Margaret A. Dale, Esq., Jennifer R. Scullion, Esq., Louis M. Solomon, Esq., Colin A. Underwood, Esq., New York, NY, Greenbaum, Rowe, Smith, Davis & Himmel LLP, by Richard L. Hertzberg, Esq., Woodbridge, NJ, for Defendant Andrx Pharmaceuticals, Inc.

Saiber, Schlesinger, Satz & Goldstein, LLC, by Arnold B. Calmann, Esq., Jeffrey Soos, Esq., Newark, NJ, Frommer, Lawrence & Haug LLP, by Edger H. Haug, Esq., Charles J. Raubicheck, Esq., Andrew M. Berdon, Esq., New York, NY, for Intervenor–Defendant Genpharm, Inc.

## AMENDED OPINION

BASSLER, District Judge.

This is an action pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, challenging decisions made by the Food and Drug Administration (FDA) during the generic drug approval process for one of several generic versions of omeprazole, a drug consumers know by the brand name Prilosec®. Plaintiffs Dr. Reddy's Laboratories, Inc., and Dr. Reddy's Laboratories Ltd. ("Reddy") challenge the legality of certain aspects of the FDA's interpretation of the Drug Price Competition and Patent Term Restoration Act of 1994. Hatch–Waxman Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984), codified at 21 U.S.C. §§ 355, 360, 35 U.S.C. §§ 156, 271, 282 ("Hatch–Waxman Amendments" or "the Amendments"). The FDA applied the allegedly erroneous interpretations of the Amendments in deciding that Reddy is not eligible to share a statutory exclusivity period for marketing its generic 40 mg omeprazole product with defendant Andrx Pharmaceuticals, Inc. ("Andrx").[1] Reddy now moves for summary judgment on its claims, challenging three FDA decisions, and asks the Court to vacate those decisions and remand this matter.

The generic omeprazole product at issue in this action is also the subject of a patent infringement action brought by AstraZeneca, L.P. ("Astra"), producer of Prilosec®, against Reddy, Andrx, Genpharm, and a fourth defendant. *See In re Omeprazole Patent Litigation,* 222 F.Supp.2d 423 (S.D.N.Y.2002).

---

1. Health and Human Services Secretary Tommy G. Thompson and Deputy FDA Commissioner Lester M. Crawford are also named defendants in their official capacities. The Court refers to all government defendants as "FDA." Also, the Court permitted Genpharm, Inc. ("Genpharm") to intervene in this action because of its interest in the Court's decision regarding the FDA's interpretation of the Hatch–Waxman Amendments. Genpharm is a defendant in a related action also filed by Reddy in the District of New Jersey involving 10 and 20 mg omeprazole products. *Dr. Reddy's Laboratories, Inc. v. Thompson,* Civil Action No. 02–1769(WGB). A motion filed under seal is pending in that action.

The Court finds with respect to each of the FDA's decisions here at issue that the FDA interpreted the Hatch–Waxman Amendments in a permissible manner consistent with the statutory scheme therein devised to regulate the generic drug approval process. Therefore, Reddy's motion for summary judgment is denied, and summary judgment is granted instead in favor of the FDA on all claims. Furthermore, because Reddy seeks relief only against the FDA under the APA and seeks no relief against Andrx, all claims against Andrx are dismissed.[2]

*I. Statutory & Regulatory Framework*

It is by now well understood that the Hatch–Waxman Amendments accelerate the process by which the FDA approves generic drugs for manufacture and sale. Companies desiring to produce and sell new drugs in the first instance, so-called innovator companies, must file new drug applications (NDAs) with the FDA that include, inter alia, data on whether the new drug is safe and effective in use obtained through substantial testing. 21 U.S.C. § 355(a) & (b). Companies desiring to produce and sell generic versions of already-approved new drugs, however, need not submit the same testing data. Instead, generic drug makers file abbreviated new drug applications (ANDAs), the contents of which are set by the statute, that include data showing the generic drug to be the same as or the bioequivalent of an FDA-approved drug. *See* 21 U.S.C. § 355(j)(2)(A)(iv); *Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1568 (Fed.Cir. 1997).

Because new drugs, and uses for those drugs, may be claimed by one or more patents, the Amendments insulate generic drug makers who want to submit ANDAs ("ANDA applicants") from patent infringement claims while they prepare their ANDAs for submission to the FDA. The statute designates as non-infringing activities those activities undertaken solely to develop and submit information to the FDA. *See* 35 U.S.C. § 271(e)(1); *Eli Lilly & Co.,* 496 U.S. at 671, 110 S.Ct. 2683. Upon submission of an ANDA, however, the patent owner may sue the ANDA applicant for infringement of unexpired patents claiming the drug, or a use of the drug, "if the purpose of such submission is to obtain approval under [the FDCA] to engage in the commercial manufacture, use, or sale of . . . [a drug product] claimed in a patent or the use of which is claimed in a patent before the expiration of such patent." 35 U.S.C. § 271(e)(2).

The statute requires NDA applicants to submit information on any patent that "claims such drug . . . or a method of using such drug" and for which a claim of patent infringement could reasonably be asserted against an unauthorized party. 21 U.S.C. § 355(b)(1),(c)(2). The FDA publishes that patent information in a publication titled "Approved Drug Products With Therapeutic Equivalence Evaluations," commonly called the "Orange Book." *See* 21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(a). Based upon the Orange Book listings, ANDA applicants, in turn, file with the ANDA one of four certifications, to be made "in the opinion of applicant and to the best of his knowledge," for each patent claiming the drug, or use of the drug, for which the applicant seeks approval: (I) that patent information has not been filed ("paragraph I" certification); (II) that the patent has expired ("paragraph II" certification); (III) that the patent will expire ("paragraph III" certification); (IV) or that a listed patent

---

**2.** Indeed, Reddy agreed with the Court at oral argument that there is no reason for Andrx to be a named party in this APA action. (Oral Arg. of Sept. 13, 2002 Tr. At 24:1–25.)

is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the ANDA is submitted ("paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12).

Upon filing a paragraph IV certification, ANDA applicants must give notice to the patent owner and the holder of the approved NDA, the NDA holder being the innovator. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.95. The patent owner may then sue for patent infringement pursuant to § 271(e)(2), and, if the owner does so within 45 days of receiving the notice, approval of the ANDA is stayed at least thirty months from the date the owner receives notice of the certification. 21 U.S.C. § 355(5)(B)(iii). The purpose of the 30–month stay is to allow time for patent infringement litigation. *See Ben Venue Labs., Inc. v. Novartis Pharm. Corp.*, 146 F.Supp.2d 572, 579 (D.N.J.2001). For while ANDA approval is stayed, "section 271(e)(2)(A) makes it possible for a patent owner to have the court determine whether, if a particular drug *were* put on the market, it *would* infringe the relevant patent." *Bristol–Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1135 (Fed.Cir. 1995).

To encourage prospective ANDA applicants to risk the costly patent infringement suits triggered by their filing ANDAs, the statute also provides an incentive to ANDA applicants: an applicant who files an ANDA containing a paragraph IV certification on a patent is eligible for a 180–day marketing exclusivity period during which no other generic drug maker who subsequently files an ANDA containing a paragraph IV certification on that

patent can be approved for marketing its version of the drug product. *See Minnesota Mining and Mfg. Co. v. Barr Lab., Inc.*, 289 F.3d 775, 778 (Fed.Cir.2002); *Mova Pharm. v. Shalala*, 140 F.3d 1060, 1064 (D.C.Cir.1998). This marketing exclusivity period starts on the earlier of the date the first-to-file ANDA applicant begins commercially marketing its generic drug or the date of "a decision of a court" finding the patent invalid, unenforceable, or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv); 21 C.F.R. 314.107(c)(1) & (2).

With respect to the omeprazole drug products, patent infringement issues have been adjudicated in the New York litigation and are now on appeal. This APA action is about whether the FDA properly determined that Reddy is not entitled to the 180–day marketing exclusivity period for its 40 mg generic omeprazole product based upon the paragraph IV certification it filed with its ANDA. More generally, this action is about the scope of the FDA's authority to review the contents of abbreviated new drug applications. Before analyzing the FDA's interpretation and application of the specific statutory provisions challenged in this action, the Court reviews the factual basis for Reddy's claims and the procedural posture of the case.

## II. Factual & Procedural Background

### A. The Omeprazole Delayed-release Capsule ANDAs

At the time the FDA rendered its decisions on the Reddy ANDA, Astra had listed eleven patents in the Orange Book.[3] A review of the certifications filed for those patents is in order.

---

**3.** Initially, seven patents were listed for Prilosec®: U.S. Patent Nos. 4,786,505 ('505), 4,853,230 ('230), 4,636,499('499), 5,599,794 ('794), 5,629,309 ('309), 5,093,342 ('342), and

4,255,431 ('431). In the April, 2001, Astra listed four additional patents: U.S. Patent Nos. 6,147,103 ('103), 6,150,380 ('380), 6,166,213 ('213), and 6,191,148 ('148).

On March 17, 1998, Andrx submitted to the FDA an ANDA (ANDA No. 75–347) seeking approval to market 10 mg and 20 mg strengths of omeprazole. (Administrative Record (A.R.) 24.) Its application included one paragraph III certification ('431) and six paragraph IV certifications for patents listed in the Orange Book for Prilosec ('499, '505, '230, '342, '794, '305). (A.R. 24.) Andrx amended its ANDA on September 28, 1998, requesting approval of a 40 mg strength product as well. The amendment contained the same patent certifications as the application for the 10 mg and 20 mg strength products. (A.R. 29.)

On March 20, 1998, Genpharm submitted its ANDA (ANDA No. 75–268) for 10 mg and 20 mg omeprazole, including the same six paragraph IV certifications and one paragraph III certification that Andrx had included. (A.R. 54.) Genpharm did not seek approval for a 40 mg product.

On April 9, 1998 Andrx amended the proposed labeling it had submitted to the FDA, removing from the label language describing the use of omeprazole in combination with clarithromycin to treat H. pylori associated duodenal ulcer. (A.R. 90 at 2.) This method of using omeprazole was claimed by three patents listed in the Orange Book '794, '305, '342 (the "method of use patents"). On December 23, 1998, at the FDA's behest, Andrx withdrew its paragraph IV certifications to these three method of use patents. Having "carved-out" this use of omeprazole from its label, Andrx replaced its paragraph IV certification on the method of use patents with section viii statements that the method of use patents do not a claim a use for which Andrx sought approval. (A.R. 31.)

On February 3, 1999, Reddy submitted its ANDA (ANDA No. 75–576) for a 40 mg omeprazole product. (A.R. 1.) Its application included the six paragraph IV certifications that Andrx had submitted nearly one year earlier with respect to the 10 mg and 20 mg strengths and over fours months earlier with respect to the 40 mg strength. But unlike Andrx, Reddy included a paragraph IV certification for the '431 patent rather than a paragraph III certification. (*Id.*) On April 20, 1999, Astra filed a patent infringement action against Reddy alleging infringement of each patent already noted. (A.R. 4, 5.) Reddy amended its ANDA on January 26, 2000 to include 10 mg and 20 mg strength Omeprazole Delayed-release Capsules. (A.R. 7.)

While these ANDAs were pending, Astra listed additional patents for Prilosec®. Genpharm then amended its ANDA for 10 mg and 20 mg application with additional paragraph IV certifications for patents '380, '103, and '213 on March 14, 2001 and patent '148 on April 3, 2001. Andrx similarly amended its ANDA for 10 mg, 20 mg, and 40 mg strengths on March 26, 2001. (A.R. 69, 72, 43.) And Reddy amended its ANDA for all three strengths with additional paragraph IV certifications on May 9, 2001. (A.R. 13.)

Thus, with respect to the 40 mg product, Andrx was the first to file paragraph IV certifications on ten patents ('499, '505, '230, '342, '794, '305, '380, '103, '213, '148), and Reddy first on one patent ('431). Because Andrx withdrew its paragraph IV certifications with respect to the method of use patents, Reddy was the only ANDA applicant with paragraph IV certifications on the method of use patents at the time the FDA rendered the challenged decisions.

*B. FDA Decisions on Reddy's ANDA*

The FDA tentatively approved Andrx's ANDAs for all three strengths on March 23, 2000. (A.R. 36.) On June 25, 2001, the FDA tentatively approved Reddy's ANDA for 40 mg omeprazole. (A.R. 15.) Tenta-

tive approval, however, does not constitute final approval of an ANDA. Final approval is effective only after the FDA issues a final approval letter, 21 C.F.R. § 314.107(b)(3)(v), and changed conditions may necessitate delay in the final approval of a tentatively approved ANDA. 59 Fed. Reg. 50338, 50352 (Oct. 3, 1994). With respect to these omeprazole ANDAs, the FDA could not give final approval to Reddy or Andrx until the FDA decided a scientific challenge to the generic omeprazole products lodged by Astra on July 5, 2001. (A.R. 17.) Also, the FDA required that both Reddy and Andrx conduct a "sprinkle study" before final approval would be given because of a change to the approved labeling for the drug. (A.R. 19.) Finally, the FDA instructed Reddy to inform the agency when Reddy believed its application ready for final approval. (A.R. 15 at 3.) Reddy did not so notify the FDA until October 25, 2001.

### 1. The November 16, 2001 and March 28, 2002 Decisions

The FDA issued its first letter-decision regarding Reddy's eligibility on November 16, 2001. The FDA concluded that although Reddy was the first applicant to file a paragraph IV certification on the '431 patent listed for the 40 mg strength omeprazole capsules and, as such, was eligible for exclusivity based upon that certification until the patent expired, Reddy lost that eligibility for exclusivity when the '431 patent expired on October 5, 2001, the date Astra's pediatric exclusivity period expired, prior to the occurrence of either of the triggering events described in 505(j)(5)(B)(iv)(I) & (II). (A.R. 20 at 1.) The FDA grounded its decision in its regulations, deciding that Reddy was required to amend its ANDA pursuant to 21 C.F.R. 314.94(a)(12)(viii)(C) to include a paragraph II certification on the '431 patent

because a paragraph IV certification was no longer appropriate. (*Id.* at 2.)

The FDA issued its second letter-decision regarding Reddy's eligibility based upon the '431 on March 28, 2002. That decision was prompted by Reddy's February 25, 2002 telephone call informing the FDA of a May 29, 2001 summary judgment decision in the New York patent litigation with respect to the '499 patent. Reddy argued that the decision on the '499 patent rendered Reddy eligible for exclusivity based upon the '431 patent before that patent expired, even though Reddy first notified the FDA of the '499 decision fully four months after Reddy first informed the FDA that its ANDA was ready for final approval, three months after the FDA made its first decision on Reddy's ANDA, and nine months after the '499 patent summary judgment decision. FDA regulations require an applicant to notify the FDA of a triggering decision "within ten working days" of its issuance. 21 C.F.R. § 314.107(e)(2)(iv).

After explaining, again, its position that Reddy was not eligible for exclusivity after the '431 patent expired, the FDA addressed Reddy's new argument that it was eligible for exclusivity, or shared exclusivity with Andrx, based upon the '431 patent because of the decision on the '499 patent notwithstanding Reddy's untimely notification. The FDA rejected Reddy's argument. The FDA decided, for reasons explained below, that neither Reddy nor Andrx was entitled to exclusivity before the '431 patent expired on October 5, 2001 under the FDA's patent-by-patent exclusivity analysis. Moreover, the patent expired before Reddy's ANDA was ready for final approval because: (1) Reddy did not notify the FDA that it was ready for final approval until October 25, 2001; (2) the FDA did not complete its review of a scientific challenge to generic omeprazole

until November 16, 2001; and (3) not until after the patent expired did Reddy complete the "sprinkle study" for its omeprazole product, a study made necessary by a change to the labeling of the innovator drug. (A.R. 23 at 6.)

### 2. The May 28, 2002 Decision

After the FDA rejected Reddy's arguments for exclusivity based upon the '431 patent, Reddy next sought exclusivity based upon the three method of use patents on which Reddy, but not Andrx, had retained its paragraph IV certifications. FDA rejected that basis for exclusivity as well. By letter-decision of May 28, 2002, the FDA concluded that Reddy was not entitled to exclusivity based upon its paragraph IV certifications for the therapy patents because those certifications were improper. According to the FDA, a paragraph IV certification is appropriate on a method of use patent only when an ANDA applicant's proposed labeling for its generic drug includes the method of using the listed drug. Because Reddy's proposed label, like Andrx's proposed label, "carved out" the method of using omeprazole claimed by the therapy patents, the FDA concluded that Reddy had to submit section viii statements, not paragraph IV certifications, with respect to the therapy patents. (A.R., tab 90.) For this reason, the FDA refused to grant Reddy exclusivity based upon the therapy patents.

### C. Litigation History

That Reddy challenges these three FDA decisions denying it eligibility only became clear after Reddy amended its complaint. At the time Reddy first filed this action against the FDA, its officials, and Andrx on January 31, 2002, the FDA had made only its November 16, 2001 decision. Reddy moved by order to show cause soon after filing its complaint for a judgment directing the FDA to withdraw its November 16, 2001 determination that Reddy was not entitled to exclusivity based upon the '431 patent. At that time, it also appeared Reddy was seeking injunctive relief of some sort and wanted the Court to review the FDA's decision on Andrx's 40 mg ANDA.

Because Reddy had not invoked a procedural mechanism by which the Court could award the judgment and injunctive relief that it sought, the Court ordered the parties to submit memoranda on the issue prior to oral argument, which was held on September 13, 2002. (Order of Sept. 4, 2002.) Of course Reddy had several procedural vehicles available to it; it just had to pick one. Meantime, briefing on the order to show cause was completed, but both the FDA and Reddy presented arguments that had not been addressed in the context of the ANDA approval process. The FDA then rendered the March and May decisions to address all of Reddy's concerns about the FDA's 40 mg exclusivity decision.

All parties agreed at oral argument on the order to show cause that an amended complaint was appropriate to clarify that Reddy was in fact challenging three FDA decisions, was invoking the Court's authority to review those decisions pursuant to the APA, and was seeking a Court order vacating the FDA's decisions and remanding this matter. The Court granted Reddy leave to amend its complaint, without objection, and Reddy did so. Reddy then moved for summary judgment pursuant to Fed.R.Civ.P. 56, asking the Court to find the FDA's three decisions arbitrary, capricious, and contrary law.

### III. Standards of Review

 Decisions of the FDA are subject to judicial review by a district court pursuant to the APA. *See Abbott Labs. v. Gard-*

*ner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). This being an action pursuant to the APA, the Court sits as an appellate tribunal, and the entire case on review is a question of law. *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C.Cir.2001). Reddy challenges as arbitrary, capricious, and contrary to law the FDA interpretations of the Hatch–Waxman Amendments relied upon in rendering the three decisions on Reddy's ANDA. Even if the FDA permissibly construed the statute, Reddy also challenges the FDA's application of the statute and regulations construing the statute to its ANDA.

## A. Review of the FDA's Statutory Interpretations

■ The Court will vacate the FDA decisions only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Sultan Chemists, Inc. v. U.S. EPA*, 281 F.3d 73, 78–79 (3d Cir.2002). This standard of review is highly deferential to the agency, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), though the amount of deference owed the FDA's interpretation of its own statute varies depending upon the circumstances in which that interpretation is made. *United States v. Mead*, 533 U.S. 218, 227–31, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

■ The highest level of deference— *Chevron* deference—applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226–27, 121 S.Ct. 2164; *Robert Wood Johnson Univ. Hospital v. Thompson*, 297 F.3d 273, 281 (3d Cir.2002). Under *Chevron*, the Court applies a two-step analysis.

*Schering Corp. v. Food and Drug Administration*, 51 F.3d 390, 397 (3d Cir.1995). "First, if the statute speaks clearly "to the precise question at issue," the Court must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Second, where the statute is "silent or ambiguous with respect to the specific issue," the Court sustains the agency interpretation if it is based on a "permissible construction" of the statute. *Id.* at 843, 104 S.Ct. 2778.

■ Where *Chevron* deference is not owed, a court still may accord deference to agency interpretations "made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case," so long as the agency thoroughly considers the statute, supplies valid reasoning for its interpretation, and renders a decision consistent with other agency pronouncements. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Mead*, 533 U.S. at 234, 121 S.Ct. 2164 (citing *Skidmore*). A court owes little deference to agency interpretations announced for the first time in a litigation brief. *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *Mead*, 533 U.S. at 228–31, 121 S.Ct. 2164 (citing *Bowen*); *Robert Wood Johnson*, 297 F.3d at 281.

■ *Bowen* is not applicable to the FDA interpretations at issue here. Though Reddy contends that the FDA's positions in this action appear for the first time in the briefs, that is true because Reddy itself presented new arguments through its briefs, before the FDA had the opportunity to consider them in the administrative context. There is no indication that the FDA's interpretations constitute a post-

hoc rationale made only to defend its decisions from Reddy's challenge or that the decisions fail to reflect the agency's fair and considered judgment. *Cf. Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). The reasoning articulated by the FDA in its letters to Reddy was consistently applied throughout the omeprazole generic drug approval process.

Instead, *Chevron* analysis governs the Court's review of the FDA's statutory interpretations here at issue. Again, *Chevron* analysis is appropriate where "Congress delegated authority to the agency generally to make rules carrying the force of law." *Mead*, 533 U.S. at 226–27, 230, 121 S.Ct. 2164. Congress clearly did so with both the FDCA as a whole and the Hatch–Waxman Amendments in particular. The FDCA specifically authorizes the FDA "to promulgate regulations for the efficient enforcement of" the statute. 21 U.S.C. § 371(a). The Hatch–Waxman Amendments do so as well, authorizing the FDA to promulgate regulations "necessary for the administration" of the amendments. *See* 21 U.S.C. § 355 note, Pub.L. No. 98–417, § 105, 98 Stat, 1585, 1597 (1984).

## B. Review of the FDA's Interpretation of its Own Regulations

■ To the extent Reddy challenges the FDA's interpretation of its own regulations promulgated under the Hatch–Waxman Amendments and not the FDA's interpretation of the statute itself, the Court owes the FDA "substantial deference." *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). The FDA's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations and quotation

omitted); *Chong v. Dist. Director, INS*, 264 F.3d 378, 389 (3d Cir.2001).

## IV. Discussion

Reddy proffered two bases for exclusivity on the 40 mg product during the ANDA review process, the '431 patent and the therapy patents. The FDA rejected both bases for exclusivity in the three separate letter-decisions. Reddy asks the Court to vacate those decisions and remand each decision to the FDA for further consideration. The Court will not do so.

## A. Effect of the New York Patent Infringement Litigation

■ Before explaining why the FDA's decisions withstand judicial review, a threshold issue is the effect on this APA action of the October, 2002 decision in the New York patent infringement action. In the patent litigation, the court found that Reddy, Andrx, and Genpharm infringed certain patents claiming Astra's omeprazole product. The fourth defendant was found not to have infringed. Andrx argues that the New York court's finding of infringement renders Reddy's APA claims moot because Reddy is now enjoined from selling its omeprazole product until at least 2007, the time at which the last of the infringed omeprazole patents expires. *See* 35 U.S.C. § 271(e)(4)(A). Reddy argues that its APA claims continue to present a justiciable controversy because, if the Court finds that the FDA improperly denied Reddy exclusivity and the FDA were to award Reddy exclusivity for the 40 mg product, Reddy would be able to sell the rights to that exclusivity to another generic drug maker who does not infringe Astra's patents. The FDA agrees with Reddy that the Court should decide whether Reddy is entitled to exclusivity based upon either the '431 patent or the therapy patents.

This action is not rendered moot by the New York court's finding of infringement. The judicial power extends only to cases or controversies, and Article III does not allow the Court to decide moot cases. *See Rosetti v. Shalala,* 12 F.3d 1216, 1224 (3d Cir.1993). Therefore, the Court lacks jurisdiction to adjudicate Reddy's claims if "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome" of the litigation. *See City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). Though Andrx argues that Reddy itself cannot market its generic omeprazole product prior to expiration of the patents, it appears that Reddy could sell to another generic maker who could use any exclusivity period to which Reddy is entitled under the law, just as Andrx and Genpharm have done with respect to their exclusivity rights for the 10 and 20 mg products. (Andrx Letter of Jan. 10, 2003 at 1–2.) That potential benefit to Reddy is not made speculative merely because Reddy presents no buyer waiting in the wings to purchase its right. After all, Reddy does not have any entitlement to exclusivity to sell at this time. Nor does the fact that only a fraction of omeprazole prescriptions are made at the 40 mg strength rather than the 10 and 20 mg strengths render Reddy's claims moot. The claims need not involve the majority of drug prescriptions to present a justiciable controversy.

**B. *Whether the FDA Properly Concluded that Reddy is not Entitled to Co-Exclusivity with Andrx for Marketing a 40mg Omeprazole Based on the '431 Patent***

■ Turning then to Reddy's claims, one basis for exclusivity advanced by Reddy is its paragraph IV certification on the '431 patent, which expired on October 5, 2001, one month before the FDA evaluated Reddy's ANDA for final approval. Apply-ing its regulations, the FDA denied Reddy exclusivity because the '431 patent had already expired at the time it rendered the exclusivity decisions in November, 2001 and March, 2002. The Court reviews the FDA's interpretations of the Hatch–Waxman Amendments relied upon in reaching these decisions under *Chevron* and the FDA's interpretation of its own regulations under the "substantial deference" standard.

**1. *Whether the Statute Unambiguously Forbids the FDA's Interpretation***

The Hatch–Waxman Amendments required Reddy, like all applicants, to include in its ANDA certain certifications with respect to each patent held by Astra on its pioneer omeprazole product, including paragraph II certifications if a patent has expired and a paragraph IV certification if the patent "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." 21 U.S.C. § 355(j)(2)(A)(vii). Because circumstances change after applicants file their ANDAs, the FDA has promulgated regulations requiring applicants to keep the certifications contained in their ANDAs accurate until the date of final approval:

> (viii)Amended Certifications. A certification submitted under paragraphs (a)(12)(i) through (a)(12)(iii) of this section may be amended at any time before the effective date of the approval of the application ... An applicant shall submit an amended certification by letter or as an amendment to a pending application or by letter to an approved application. *Once an amendment or letter is submitted, the application will no longer be considered to contain the prior certification.*
>
> . . .

(C)Other Amendments. (1) Except as provided in paragraphs (a)(12)(vi) and (a)(12)(viii)(C)(2) of this section, *an applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate.*

21 C.F.R. § 314.94(a)(12)(viii)(C)(1)(emphasis added). Applying this regulation, the FDA will not grant exclusivity based upon a paragraph IV certification on a patent that has expired at the time the exclusivity decision is made. In the FDA's view, if a patent expires before final approval, the second part of the regulation emphasized above requires an ANDA applicant to change its certification on that patent from a paragraph IV to a paragraph II certification. At that time, the FDA no longer considers the ANDA to include the paragraph IV certification, and the applicant is no longer eligible for exclusivity based upon that patent pursuant to the first part of the regulation emphasized above.

The FDA explained this interpretation of the statute at least twice prior to its decision on Reddy's application. In 1994, the FDA issued exclusivity regulations explaining that, for purposes of exclusivity determinations, "a patent is deemed to be relevant until the end of the term of the patent or applicable 180–day period, whichever occurs first." 59 Fed.Reg. 50338, 50348 (Oct. 3, 1994). And in a 1999 response to a citizen's petition involving the drug cisplatin, the FDA explained that because exclusivity cannot extend beyond the expiration of a patent, an ANDA applicant who is first to file a paragraph IV certification on a patent loses its eligibility

for exclusivity based upon that patent when the patent expires before either of the triggering events occurs. (A.R. 81 at 4.)

Reddy contends, however, that this interpretation of the statute is contrary to the unambiguous language of § 355(j)(5)(B)(iv), which sets the only requirements for exclusivity:

If an application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a *previous application has been submitted under this subsection continuing [sic] such certification,* the application shall be made effective not earlier than one hundred and eighty days after—(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv)(emphasis added).[4] In Reddy's view, this provision requires the award of exclusivity if the ANDA applicant is the first applicant to file a paragraph IV certification on a patent, without more, because at that time the ANDA applicant exposes itself to patent litigation by providing the requisite notice of the certification. Reddy notes that nothing in the statute requires an applicant to amend its certifications once they are filed if the applicant does not want to do so, and therefore the FDA's interpretation of the statute is arbitrary and capricious because the statute required the FDA to approve Reddy's ANDA at the

---

4. Courts reviewing this statute have commented that the word "continuing" ought to be "containing." *See, e.g., Purepac Pharm. Co. v. Freidman,* 162 F.3d 1201, 1203 n. 3 (D.C.Cir.1998); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1063 n. 3 (D.C.Cir.1998). The parties, and the Court, agree.

time the 30 month stay expired. Reddy also contends that even if the regulation requiring it to amend its certification was permissible, it was eligible for exclusivity because the statute does not require an ANDA applicant to maintain a valid paragraph IV certification up through the time of final approval.

Reddy thus presents two issues of statutory construction with its challenge to the FDA's regulation interpreting this part of the statute: (1) whether the FDA can require an ANDA applicant to amend certifications, and (2) whether, to be eligible for exclusivity, an ANDA must contain a paragraph IV certification at the time of filing only or at the time the FDA makes its exclusivity determination. The statute clearly addresses neither issue.

### a. FDA Authority to Require ANDA Amendments Prior to Final ANDA Approval

In fact, the statute is silent on the first issue, whether the FDA can require an applicant to amend its certifications. The statute recognizes that ANDAs may require amendment after submission to the FDA with the provision that notice be given a patent owner and innovator if an ANDA applicant adds a paragraph IV certification. *See* 21 U.S.C. § 355(j)(2)(B)(iii)(requiring ANDA applicant who adds paragraph IV certification to give notice and explanation to patent owner and NDA holder). The statute also gives the FDA some authority to review the contents of an ANDA prior to its granting final approval: the FDA need not approve an ANDA if "the application does not meet any other requirement of paragraph (2)(A)," which sets the required contents of an ANDA, or if "the application contains an untrue statement of material

fact." *See* 21 U.S.C. § 355(j)(4)(J) & (K). Paragraph IV certifications being a "requirement of paragraph 2(a)," it appears that the statute permits the FDA review to ensure that the certifications constitute "true statements of material fact."

Yet, these provisions do not address the precise issue presented. The statute is silent on other ANDA amendments and whether the FDA may require an ANDA applicant to amend its certifications prior to final ANDA approval. Because Congress does not speak clearly to that issue, the Court proceeds to step two of the *Chevron* analysis on this issue.

### b. Whether an ANDA must Contain a Paragraph IV Certification on a Patent at the Time of the FDA's Exclusivity Decision for an Applicant to be Eligible for Exclusivity Based Upon that Patent

Nor did Congress speak clearly to the second issue, whether an ANDA must contain the paragraph IV certification at the time of final approval. In its March, 2002 decision-letter, the FDA explained that to be eligible for exclusivity, an ANDA "must continue to contain a paragraph IV certification" until the FDA issues final approval. (A.R. 25 at 5.) Reddy argues that the FDA misconstrues the statute and that "containing" does not mean "continuing to contain." No deference is owed the FDA if the statutory language is clear and unambiguous when the statute as a whole is considered. *See Schering*, 51 F.3d at 397; *Mova*, 140 F.3d at 1068; *aaiPharma*, 296 F.3d at 238. But considering § 355(j) as a whole, the phrase "a drug for which a previous application has been submitted . . . [containing] such certification" is ambiguous.[5]

**5.** Andrx agrees with the FDA's position and tries to bring clarity to this ambiguous provi-

sion by looking to the language of the phrase itself. Andrx submits that the phrase is clear

On the face of this provision alone, it appears the FDA should look to the ANDA at the time it was submitted. Exclusivity is to be awarded to the applicant whose ANDA was first "submitted ... [containing] such certification." "Containing such certification" restricts the phrase "previous application [ ] submitted." But eligibility for exclusivity cannot be restricted to ANDAs that contain certifications at the time the ANDA is first filed. As noted above, the statute explicitly recognizes that applicants may amend an ANDA with additional paragraph IV certifications after the initial submission to the FDA. *See* 21 U.S.C. § 355(j)(2)(B)(iii). When certifications are added post-submission, the ANDA was not "submitted containing" them. Yet Congress imposes the same notice requirement on applicants who add paragraph IV certifications, *see* § 355(j)(2)(B)(iii), which requirement exposes the applicant to patent litigation and the concomitant benefit of marketing exclusivity based upon patents for which the applicant was first to file the certification.

Indeed, nothing in the statute suggests that applicants are not eligible for exclusivity based upon paragraph IV certifications submitted as amendments to rather than with the original ANDA. Patent infringement actions pursuant to section 271(e)(2) in fact have been brought against applicants on the basis of paragraph IV certifications added by amendment to ANDAs. *See, e.g., Ben Venue Lab.,* 146 F.Supp.2d at 581 (noting suit brought after applicant filed paragraph IV certification with amended ANDA that included new dosage).

These conflicting statutory provisions create an ambiguity that cannot be clarified by reference to the statute itself. Nor does the legislative history help. The legislative history on section 355(j)(B)(iv) is sparse and makes no mention, express or otherwise, of Congress's intent on this issue. *See* 1984 U.S.C.C.A.N. 2647, 2661; *Mova,* 140 F.3d at 1072 ("The legislative history of section 355(j)(5)(B)(iv) is limited...."). Therefore, the Court proceeds to step two of the *Chevron* analysis on this issue as well.

### 2. Whether the FDA's Interpretations Are Permissible

The Court must sustain the FDA's interpretation if it is a permissible construction of the Amendments. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. If the FDA's interpretation "fills a gap or defines a term in a way that is reasonable in light of the congressional purpose in enacting the statute," the Court defers to the FDA's interpretation. *Schering Corp.,* 51 F.3d at 399. In making this assessment, the Court "may draw from the language of the statute, the legislative history, the agency regulations adopted to implement the statute and the agency comments regarding the regulations." *Id.*

Reddy argues, in effect, that the FDA's interpretation is not permissible because the 30 month stay on approval of an ANDA containing a paragraph IV certification pursuant to § 355(j)(5)(B)(iii) is "the time period in which the legislature ex-

because the word "containing" is a gerund, which indicates the present tense. The word "containing" is a present participle modifying "submitted," not a gerund. *Cf.* William Strunk, Jr. & E.B. White, *The Elements of Style* 13 (3d Ed.1979)(noting difference between gerund and present participle); *Grammar Bytes!,* www.chomp-

chomp.com/terms/gerund.htm (visited July 16, 2003)(same). Regardless, considering the statute as a whole, the question remains whether the phrase refers to an application "containing" a paragraph IV certification at the time of submission, anytime during the ANDA review process, or at the time of the exclusivity decision.

pected these cases to be litigated." (Reddy Memorandum of May 17, 2002 at 31.) Therefore, in Reddy's view it is unfair to deny 180–day exclusivity for applicants like Reddy who file paragraph IV certifications well in advance of a patent's expiration date just because final approval of its ANDA was delayed by events beyond its control. Reddy filed its paragraph IV certification 33 months before the '431 patent expired on October 5, 2001, but the FDA did not render its decision with respect to exclusivity for the 40 mg omeprazole products until November 16, 2001.

But Reddy offers no explanation as to why Congress's provision for the 30–month stay on ANDA approval—a stay intended to allow patent infringement suits against ANDA applicants—renders impermissible the FDA's regulations governing ANDA amendments prior to final approval. The stay provision is separate from the exclusivity provision, and there is no indication in the statute or legislative history that the expiration of the stay should affect exclusivity determinations.

### a. The FDA's Regulation Requiring ANDA Amendments is a Permissible Construction of the Statute

The statute requires ANDA applicants to file a paragraph II certification stating "that such patent has expired" for an expired Orange Book-listed patent. 21 U.S.C. § 355(j)(2)(A)(ii). A paragraph II filing does not result in 180–day exclusivity because, again, the purpose of the exclusivity period is to provide an incentive to challenge patents that block ANDA approval. *Mylan Pharm. v. Henney*, 94 F.Supp.2d 36, 40 (D.D.C.2000), *vacated as moot*, 276 F.3d 627 (D.C.Cir.2002). Once a listed patent expires, there is no longer a need to provide an incentive to challenge it in court. Consistent with this statutory purpose, the FDA construes the statute to award 180–day exclusivity based only upon paragraph IV certifications to unexpired patents. *See* 59 Fed.Reg. 50338, 40348. This construction makes sense in terms of the basic statutory objective of encouraging ANDA applicants to challenge listed patents that prevent final ANDA approval.

It is of course true, as Reddy argues, that a delay in the FDA's approving an ANDA containing a paragraph IV certification on a patent that is close to expiring may result in that patent expiring before an applicant can win a 180–day exclusivity period based upon it. Such delay may be caused intentionally by the innovator or a competing generic maker seeking approval, and delay would not serve one of the purposes of the Hatch–Waxman Amendments, moving generic drugs to market as quickly as possible.

But it is also true that an ANDA applicant could benefit in a way not consistent with the purposes of the statute if the FDA did not require an amended certification upon a patent's expiration. An ANDA applicant could file a paragraph IV certification to obtain 180–day exclusivity but then immediately change its certification to a paragraph III certification, thereby avoiding the risk of litigation by filing a paragraph IV certification on a patent that will soon expire. This is not what Reddy has done here. Reddy wants to keep its paragraph IV certification, and Astra sued Reddy for patent infringement. The example is meant to show only that the FDA's interpretation is a permissible one given the language and purpose of the statute. The existence of other permissible interpretations does not render the one chosen by the FDA contrary to law. *See Abbott Lab. v. Young*, 920 F.2d 984, 988 (D.C.Cir.1990).

Finally, as noted above, the FDA may deny approval of an ANDA that fails to comply with the ANDA content require-

ments or that contains an untrue statement of material fact. 21 U.S.C. § 355(j)(4)(J) & (K). The FDA's regulations imposing a duty upon ANDA applicants to assure its certifications are accurate until the date of final approval is supported by this express FDA authority.

### b. The FDA Permissibly Construed the Exclusivity Provision

The FDA also permissibly construed the statute's exclusivity provision. Again, Reddy contends that the FDA's interpretation of the phrase "submitted [containing] such certification" is not permissible because it is inconsistent with one purpose of the statute, namely, to provide ANDA applicants an incentive to file paragraph IV certifications and seek FDA approval. Reddy explains that even if a patent expires before final approval, an ANDA applicant who has submitted a paragraph IV certification on the patent has already incurred the risk and cost of patent litigation. Reddy notes that the incentive operated appropriately in this case because it "vigorously litigated the validity of the '431 patent" before it expired, but court delays prevented trial before the expiration date. (Reddy Memorandum of May 17, 2002 at 26.) Therefore, the phrase at issue must mean an application "containing" a paragraph IV certification at some time during the approval process, not the time of final approval, else the incentive to ANDA applicants like Reddy is removed.

Reddy's interpretation is certainly permissible. That Reddy's interpretation is permissible, however, does not render the FDA's interpretation impermissible. Again, the FDA may choose from among permissible interpretations when a statute is ambiguous. *See Abbott Lab.*, 920 F.2d at 988. It is also permissible for the FDA to give effect to the statute's proscription against exclusivity based upon a patent for

which a paragraph II certification is on file at the time of final approval. Although Reddy filed its paragraph IV certification well in advance of the '431 patent's expiration and litigated the patent's validity, Reddy's interpretation, were it adopted by the FDA, would permit the same result that could obtain if the FDA were not allowed to require amendments to certifications in the first place: an ANDA applicant could garner first filer status by filing a paragraph IV certification and then quickly change to a paragraph III certification to avoid litigation. That result would not be consistent with the purpose of the statute, and it is avoided with the FDA's interpretation. Therefore, the FDA's interpretation of the phrase "[containing] such certification," though not the only permissible interpretation, is permissible nonetheless and must be sustained.

### 3. Review of the FDA's Interpretation of its Regulations

Reddy also challenges the FDA's interpretation and application of the regulation at issue, 21 C.F.R. § 314.94(a)(12)(viii). The Court assesses this challenge by asking whether the FDA's interpretation of its own regulations is plainly erroneous or inconsistent with the regulation. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations and quotation omitted); *Chong v. Dist. Director, INS*, 264 F.3d 378, 389 (3d Cir.2001). It is not.

Reddy first contends that the regulations governing ANDA amendments, even if permissible interpretations of the statute, apply only to changes from paragraph IV to paragraph III certifications and are therefore inapposite to Reddy's case. (Reddy Memorandum of May 17, 2002 at 28.) Reddy misreads the regulation. Reddy derives this argument, it seems, from the FDA's citing in its letter-decision

a case involving an applicant's changing from a paragraph IV to a paragraph III certification. (A.R. 23 at 5)(citing *Mylan,* 94 F.Supp.2d at 56–58.) But that case was offered as an example, the decision being one of the few times a court discussed certification amendments. The regulation therein applied—the same regulation applied to Reddy's ANDA—is not restricted to changes from paragraph IV to paragraph III certifications, though portions of the regulation specifically address that change. 21 C.F.R. § 314.94(a)(12)(viii)(C)(1) reads: "Other Amendments ... [A]n applicant *shall amend a submitted certification, if at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate.*"

The FDA clearly stated in its decision letters on Reddy's ANDA that it was applying that provision, and the clear language of the regulation required Reddy to change its paragraph IV certification to paragraph II upon learning that the '431 patent had expired on October 5, 2001. Therefore, the FDA's interpretation is not plainly erroneous or inconsistent with the statute; it is plainly consistent with the regulation and is entitled to substantial deference. Reddy was required to amend its certification because the '431 patent expired prior to final approval of Reddy's ANDA.[6]

Reddy also contends that the FDA's interpretation of its regulation is rendered arbitrary and capricious because the FDA inconsistently interpreted the effect of a changed certification on exclusivity from case to case. The regulation states: "Once an amendment or letter is submitted, the application will no longer be considered to contain the prior certification." § 314.94(a)(12)(viii). Reddy notes that in the recent past, the FDA interpreted this provision as having no effect on exclusivity because the regulation performs a "purely ministerial function" and awarded exclusivity to an ANDA applicant who changed from a paragraph IV to a paragraph III certification. *Mylan,* 94 F.Supp.2d at 57. Two courts criticized this interpretation, however, and one court found the interpretation to be arbitrary and capricious because it was inconsistent with the regulation. *See Mova,* 140 F.3d at 1071 (criticizing the interpretation); *Mylan,* 94 F.Supp.2d at 57 (finding the interpretation arbitrary and capricious because based upon "internally inconsistent reasoning" without "cogent explanation"). The FDA defends its changed position on the effect of amended certifications as a response to the criticism that its former position was inconsistent with the regulation. (A.R. 25 at 5.)

■ The change does not of itself render the interpretation erroneous or inconsistent with the statute; the new position in fact accurately reflects the plain language of the regulation that the FDA would no longer consider the ANDA to contain a certification removed by amendment. Nor is this changed interpretation precluded by the APA.[7] The APA precludes an agency from making "a fundamental change in its interpretation of a

---

6. Reddy's ANDA therefore differs from *Mylan v. Thompson,* 207 F.Supp.2d 476 (N.D.W.Va. 2001), relied upon in Reddy's papers, in which the plaintiff's ANDA had already been given final FDA approval. Section 314.94(a)(12)(viii)(C) did not apply in that case.

7. The FDA urges the Court analyze FDA's changed interpretation with cases holding that deference is owed agency interpretations of statutes even when an agency changes a long-held interpretation. *See Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Chevron,* 467 U.S. at 838, 104 S.Ct. 2778. At least the D.C. Circuit, however, has held *Chevron*-style defer-

substantive regulation" that repeals or amends that regulation without notice and comment. *See Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C.Cir.1997)(citing 5 U.S.C. § 551(5)). Reddy does not argue, nor does it appear to be the case, that the FDA "amended" the regulation with the new interpretation. The FDA may not interpret away the plain meaning of a regulation it has promulgated after notice and comment. *See Caruso v. Blockbuster–Sony Music Entertainment Centre at the Waterfront*, 193 F.3d 730, 737 (3d Cir.1999)(citing 1 Kenneth Culp Davis and Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.10 at 283 (1994)("An agency is not allowed to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning.")) Having been warned by the *Mylan* court that its earlier interpretation had impermissibly distorted the plain meaning of the regulation, the FDA began interpreting the regulation consistent with the clear language of the regulation.[8]

Moreover, it is not clear that the FDA changed its position with respect to expired patents at all. Reddy cites no cases in which the FDA interpreted the regulation as allowing eligibility for exclusivity based upon an expired patent. Neither *Mova* nor *Mylan* involved a change from a paragraph IV to a paragraph II certifica-

tion. Those cases involved changes to paragraph III certifications. As Reddy itself recognizes, the FDA explained in its 1999 cisplatin decision that ANDA applicants must change the certification for an expired patent from paragraph IV to paragraph II and that eligibility for exclusivity does not extend beyond the expiration of a patent. (A.R. 81 at 4.) Thus, the FDA consistently construed the regulation as precluding exclusivity based upon an expired patent. The FDA's applying that regulation to Reddy's ANDA is not, therefore, plainly erroneous or inconsistent with the statute by reason of an inconsistent prior application of the regulation.

Reddy ignored a clear requirement set forth in the regulation and failed to amend its certification after the '431 patent expired. The FDA did not erroneously apply its own regulation when it decided that Reddy's paragraph IV was no longer valid because Reddy failed to make the requisite change to its certification. To hold otherwise would permit ANDA applicants like Reddy to circumvent mandatory FDA regulations that effectuate a permissible interpretation of the statute by simply ignoring them.

*4. Whether Reddy was entitled to share exclusivity prior to the expiration of the '431 patent*

Finally, Reddy challenges the FDA's decision by arguing that even if it was not

---

ence inapplicable to changes in agency interpretations of regulations because Congress specifically expressed its will on the subject of regulations through the APA. *See Paralyzed Veterans*, 117 F.3d at 586. The Court finds APA-based reasoning persuasive.

**8.** Reddy also argues that the FDA abused its discretion because the FDA applied its new interpretation of the language of its ANDA amendment regulation retroactively to Reddy's ANDA but applied its new interpretation of the statutory phrase "a decision of a court" prospectively. Reddy thinks the FDA decided to "treat two very similar situations in a dia-

metrically opposed fashion." (Reddy Brief of May 17, 2002 at 29.) But the changed interpretations are entirely dissimilar. With respect to the ANDA amendment provision, the FDA changed its interpretation of its regulation to conform to the plain meaning of that text of that regulation. With respect to the statutory phrase "decision of a court," the FDA had to change the formal regulation that had defined "court" to mean "the court that enters final judgment from which no appeal can be or has been taken." *See* 21 C.F.R. 314.107(e)(1)(1999).

entitled to exclusivity based upon its certification to the '431 patent after it expired, Reddy was entitled to exclusivity before the patent expired because the May, 2001 summary judgment decision on the '499 patent in the patent litigation was a "decision of a court" that triggered, and thereby vested in Reddy, eligibility for exclusivity based upon the '431 patent. This argument stems from an arguable ambiguity in the statute.

As noted above, the 180–day marketing exclusivity period begins to run on the earlier date of a "decision of a court" finding a patent invalid or not infringed or the date the generic drug maker who has exclusivity begins marketing its product. 21 U.S.C. § 355(j)(5)(B)(iv). Prior to March 2000, the FDA interpreted the phrase "a decision of a court" to mean a decision by "the court that enters final judgment from which no appeal can be or has been taken." 21 C.F.R. § 314.107(e)(1). That FDA interpretation of the phrase withstood judicial review, albeit by unpublished disposition, in one court that found the statutory language ambiguous. *See Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4 Cir.1998)(per curiam). But other courts found the statutory language unambiguous and held the FDA's interpretation to be contrary to the plain statutory language. *Torpharm v. Shalala*, No. 97–1925, 1997 WL 33472411 (D.D.C. Sept. 15, 1997), U.S. Dist. LEXIS 21983; *Mylan Pharma. Inc. v. Shalala*, 81 F.Supp.2d 30 (D.D.C.2000).

The FDA conformed its interpretation to the *Mylan* court's interpretation and issued new, informal guidance explaining that with respect to ANDA applications submitted after publication of the new guidance, the FDA would interpret "court" to mean "the first court that renders a decision finding the patent at issue invalid, unenforceable, or not infringed," without regard to whether the decision was or

could be appealed. (A.R. 82)("Mylan Guidance"). The FDA applied the Mylan Guidance prospectively only to "minimize the disruption of the ANDA approval process and lessen harm to applicants who had justifiably relied on the old definition." (Memorandum of Federal Defts. at 10; A.R. 82 at 5.)

Reddy spills much ink challenging the FDA's pre-Mylan interpretation of the phrase "decision of a court" and invites much in return. But Reddy does not address the antecedent issue: whether a court decision on the '499 patent alone would trigger exclusivity for Reddy based upon the '431 patent, even if the decision were a "decision of the court." Because the '499 patent decision could not trigger exclusivity based upon the '431 patent, the Court need not, and does not, decide whether the '499 patent decision is a "decision of a court" or whether the FDA's interpretation of that phrase is consistent with the statute.

The FDA applies a "patent-based" or "patent-by-patent" approach to determine who is entitled to the 180–day marketing exclusivity period for the 40 mg omeprazole product. Under FDA regulations, an ANDA containing a paragraph IV certification on a patent cannot be approved until the exclusivity period of the applicant that first filed an ANDA containing a paragraph IV certification with respect to the same patent has run:

> If an [ANDA] contains a [paragraph IV certification] and the application is for a generic copy of the same listed drug for which one or more substantially complete [ANDAs] were previously submitted containing a [paragraph IV certification], approval of the subsequent [ANDA] will be made effective no sooner than 180 days from [the earlier of the date the commercial trigger or court decision trigger is pulled].

21 C.F.R. 314.107(c)(1). Because innovators often list multiple patents in the Orange Book for a single new drug product, however, different ANDA applicants may file an ANDA containing paragraph IV certifications for one or more of those multiple patents relating to that drug product. Therefore, the FDA has applied, since 1999, its patent-based analysis in determining eligibility for exclusivity. (A.R. 81.) Under that analysis, the first ANDA containing a paragraph IV certification for each patent listed by the innovator is separately eligible for 180–day exclusivity based on that patent. Only a court decision on the particular patent for which the applicant is entitled to exclusivity will trigger that applicant's exclusivity period under this patent-based approach. (*Id.*)

A problem arises, however, when different ANDA applicants are first-to-file on some, but not all, of the multiple patents listed for the same drug product. Applying the patent-based approach in that situation, the applicants are eligible for exclusivity only on the patents for which they were first-to-file. But an ANDA may not be given final approval until the exclusivity period runs for other ANDA applicants that were first-to-file a paragraph IV certification on other listed patents. The result: an "exclusivity stand-off" in which two or more ANDA applicants are eligible for exclusivity under a patent-by-patent analysis based upon their being first-to-file a paragraph IV certification on at least one patent listed for a drug, but no ANDA applicant can be granted final approval because the exclusivity periods of other ANDA applicants block approval. (A.R. 49 at 3–4 (explaining exclusivity standoff).)

Therefore, the FDA adopted a "shared exclusivity" exception when necessary to avoid this exclusivity stand-off, whereby each ANDA applicant eligible for exclusivity based upon one or more paragraph IV certifications may be given final FDA approval to market its drug product. (A.R. 76 at 3–7.) The 180–day exclusivity period for these newly-approved generic drug makers then begins to run upon the commercial marketing of the generic drug product by any one of the generic drug makers sharing exclusivity, or the "decision of a court" on any one of the patents. (A.R. 49 at 4–7 & 76 at 7 (explaining shared exclusivity analysis).) In the FDA's view, this "shared exclusivity" approach is most consistent with the statutory language and the intent of the 180–day exclusivity period. (*Id.*)

The FDA has not articulated its patent-based approach and shared exclusivity exception by separate regulation but, instead, through its case-by-case application of the statute and its regulations. Indeed, the FDA applied the shared exclusivity exception in determining Andrx's and Genpharm's exclusivity for the 10 and 20 mg omeprazole products. *Compare* (A.R. 81 at 4)(applying patent-based approach with respect to drug cisplatin) *with* A.R. 76 (applying shared exclusivity approach to 10 and 20 mg omeprazole products). Reddy does not challenge the legality of either the patent-based approach or the shared exclusivity exception, although the application of these approaches to the omeprazole ANDAs is the FDA's primary justification for its decision on Reddy's ANDA. Instead, Reddy ignores the FDA's primary argument that the application of patent-based analysis rendered the '499 patent decision irrelevant to its 40 mg product exclusivity analysis and skips right to the FDA's alternative argument that the '499 patent summary judgment decision is not a "decision of a court."

But under the FDA's patent-based approach, a decision of the Court on the '499 patent would trigger exclusivity only with respect to that patent, not the

'431 patent. The FDA applied that approach to Reddy's ANDA, and properly so. The FDA determined that there was no point "at which the Dr. Reddy ANDA was eligible for final approval, but for Andrx's eligibility for 180–day exclusivity, or vice-versa." (A.R. 23 at 4.). That determination was fully supported by the evidence in the record. Not until after the '431 patent expired did Reddy complete the required "sprinkle study" or inform the FDA its ANDA was ready for final approval. And not until after the '431 patent expired did the FDA complete its review of Astra's scientific challenge. (A.R. 23 at 6.)[9]

Therefore, the Court need not resolve whether the FDA properly interpreted the phrase "a decision of a court."[10] The FDA's discussion in its March, 2002 letter-decision explaining how it would interpret the phrase if shared exclusivity did apply simply does not matter because the FDA concluded in that same decision that shared exclusivity did not, in fact, apply. Based upon the administrative record, neither that decision nor the FDA's application of its patent-based analysis to determine exclusivity for the 40 mg omeprazole product were arbitrary and capricious.

C. *Whether the FDA Properly Concluded that Reddy is not Entitled to Co–Exclusivity with Andrx for Marketing a 40mg Omeprazole Based on the "Therapy" Patents*

 Reddy's second proffered basis for marketing exclusivity is the therapy patents. Because Reddy asks the Court to review the FDA interpretations of the Amendments in this context as well, *Chevron* analysis is again appropriate. Also, because Reddy challenges the FDA's decision as lacking factual support, the Court also assesses whether the FDA's decision was arbitrary and capricious given the evidence in the record.

*1. Whether the Statute Unambiguously Forbids the FDA's Interpretation*

Again, the starting point for review of the FDA interpretation of the Hatch–Waxman Amendments under *Chevron* is the language of the statute itself. The statute provides, in relevant part:

"An abbreviated application for a new drug application shall contain... (vii) a certification, *in the opinion of the applicant and to the best of his knowledge,* with respect to each patent which claims the listed drug ... or which claims a use for such listed drug for which the applicant seeks approval under this subsection and for which information is required to be filed under subsection (b) or (c) of this section—... (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and (viii) if with respect to the listed drug referred to in clause (I) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a state-

---

9. Also, Reddy failed to inform the FDA of the allegedly dispositive '499 patent decision until seven months after that decision issued. (A.R. 23 at 9.) That despite clear regulations requiring applicants to inform the FDA of triggering decisions within 10 working days of issuance. *See* 21 C.F.R. § 314.107(e). Reddy doesn't challenge *that* regulation either, or explain why it was ignored.

10. Nor must the Court decide the effect of the '499 patent summary judgment decision on Andrx's 180–day exclusivity period either, again because the FDA was applying the patent based approach.

ment that the method of use patent does not claim such a use."

21 U.S.C. § 355(j)(2)(A)(vii) & (viii)(emphasis added).

Reddy claims that this statutory provision is clear: the decision as to what type of certification to file is the applicant's alone. Reddy cites the "opinion of the applicant" language emphasized above and FDA regulations requiring ANDAs to contain certifications, including paragraph IV certifications, "in the opinion of the applicant and to the best of his knowledge." 21 C.F.R. § 314.94(a)(12)(i)(A)(4). The FDA does not disagree with Reddy that the four certifications required by the statute are to be filed "in the opinion of the applicant." The FDA disagrees that this phrase means that the FDA has no role in assessing the propriety of the certifications filed.

According to the FDA, § 355(j)(2)(A)(viii) cannot be ignored, and that part of the statute clearly makes a paragraph IV certification appropriate for a method of use patent only when the proposed labeling for the generic drug includes the method of use claimed in the Orange Book-listed patent. If, instead, the generic applicant "carves out" that particular method of using the drug from its labeling, the applicant must submit a statement so stating. Therefore, the FDA regulations also provide:

> [T]he applicant shall submit a complete archival copy of the abbreviated new drug application that includes the following: . . .
>
> (12) Patent Certification. . .
>
> (iii) Method of use Patent. (A) If patent information is submitted under section 505(b) or (c) of the act and § 314.53 for a patent claiming a method of using the listed drug, and the labeling for the drug product for which the applicant is seeking approval does not include any indications that are covered by the use

patent, a statement explaining that the method of use patent does not claim any of the proposed indications. (B) If labeling of the drug product for which the applicant is seeking approval includes an indication that, according to the information submitted under section 505(b) or (c) of the act and § 314.53 or in the opinion of the applicant, is claimed by a use patent, an applicable certification under paragraph (a)(12)(i) of this section.

21 C.F.R. § 314.94(a)(12)(iii). Under this FDA interpretation of the statute, ANDA applicants are not free to choose between paragraph IV certifications and section viii statements. If the applicant's proposed labeling does not include the indication covered by the use patent, the regulation requires a section viii statement, not a paragraph IV certification. *See* 59 Fed. Reg. 50,338, 50,347 (Oct. 3, 1994) ("[A]n applicant does not have the option of making a certification under § 314.94(a)(12)(i)(A)(4) in lieu of, or in addition to, a statement under § 314.94(a)(12)(iii)."); 54 Fed.Reg. 28,872, 28,886 (July 10, 1989)("If there is a patent claiming a method of using the listed drug, and the labeling for the applicant's proposed drug product does not include any indications that are covered by the use patent, proposed § 314.94(a)(12)(iii) would require the applicant to submit a [section viii statement]. The applicant should not submit a [paragraph IV certification] for such a patent.") The FDA will not award exclusivity based upon a paragraph IV statement on a method of use patent for which a section viii statement should have been filed.

The precise issue before the Court, then, is whether an ANDA applicant is free to file either a paragraph IV certification or section viii statement on a patent, whichever the applicant thinks appropriate, or

whether the FDA can review the applicant's proposed labeling and conclude that a section viii statement is required rather than a paragraph IV certification, notwithstanding the applicant's opinion. Reddy would have the FDA's role be a purely ministerial one, accepting the ANDA applicant's certifications without review for accuracy. This argument relies upon the phrase, "in the opinion of the applicant" at 21 U.S.C. § 355(j)(2)(A)(vii).

But in assessing whether Congress has addressed the precise issue of the FDA's role with respect to certifications, the Court must look to the statute as a whole to determine whether Congress has unambiguously expressed its intent, not Reddy's narrowly selected text. *See aaiPharma v. Thompson,* 296 F.3d 227, 238 (4th Cir. 2002). The statute includes the requirement that an ANDA applicant submit a section viii statement when the applicant does not seek approval for a use claimed by a method of use patent. *See* 21 U.S.C. § 355(j)(2)(A)(viii). And the statute makes no mention of the applicant's opinion with respect to section viii statements. As indicated by Congress's use of the conjunctive "and" between (2)(A)(vii) and (2)(A)(viii), the statute requires both certifications, which are to be made in the opinion of the applicant, and section viii statements, which are not. The section viii statements must be made when the applicant does not seek approval for a use claimed by a method of use patent. But the statute is silent on the respective role of ANDA applicants and the FDA in determining whether a paragraph IV certification or section viii statement must be filed for a method of use patent.

The Court proceeds, therefore, to step two of the *Chevron* analysis and asks whether the FDA permissibly construed the statute.

### 2. Whether the FDA's Interpretation is Permissible

In reaching this determination, the Court again looks to the language of the statute itself, the legislative history, and the FDA's regulations. *Schering Corp.,* 51 F.3d at 399. Reddy's argument focuses upon the complexity of generic drug production and patent law, and Reddy urges upon the Court the reasoning articulated in *aaiPharma v. Thompson, supra,* an APA action challenging the FDA's interpretation of 21 U.S.C. § 355(c)(2). That provision governs Orange Book listings, and the FDA interpreted its role in the listing of patents in the Orange book as a purely ministerial one: New drug applicants list patent information in the Orange Book, generic drug makers may dispute the accuracy of the information listed in writing to the FDA, and the FDA then asks the new drug applicant to address the disputed information. *aaiPharma,* 296 F.3d at 237 (citing 21 C.F.R. § 314.53(f)). According to the FDA, that interpretation was justified by the FDA's lack of resources and expertise to police the correctness of Orange Book listings.

Applying *Chevron* analysis, the *aaiPharma* court found at step one that the statute was ambiguous on the issue of the proper role of the FDA in Orange Book listing disputes, and the court found at step two that the FDA's interpretation of the statute was permissible. *Id.* at 238. In the Fourth Circuit's view, the FDA's interpretation was permissible given the language of section 355 and the "division of intellectual labor established by the Hatch–Waxman Act," in which the parties sort out intellectual property rights through litigation while the FDA focuses on ensuring that only safe and effective drugs go to market. *Id.* at 241.

Reddy argues that the FDA's role with respect to an ANDA applicant's determi-

nation whether to file a paragraph IV or paragraph viii certification is similarly a purely ministerial one. If an ANDA applicant files a paragraph IV certification on use patents and is first to do so, then the applicant is eligible for the 180–day exclusivity period, and the FDA must recognize that eligibility. If, on the other hand, the applicant decides to file a section viii statement, then the applicant is not eligible for exclusivity.

But the interpretation at issue here does not commit the FDA to evaluating the patents listed for a drug product in the Orange Book. Instead, the FDA accepts the innovator's description of the patents listed in the Orange Book and evaluates the ANDA applicant's proposed labeling to determine for which uses the applicant seeks approval. The FDA reaches its decision with respect to the propriety of a paragraph IV certification for method of use patents by examining the ANDA applicant's generic drug labeling, something in which the FDA has a great deal of expertise. By comparing the drug label submitted by the ANDA applicant to the drug label approved for the innovator, the FDA decides whether an ANDA applicant has carved-out particular uses for a drug product that are covered by method of use patents listed in the Orange Book. (A.R. 90.)

The reason for the FDA's deference to new drug applicants with respect to the propriety of patents listed in the Orange Book is simply absent with respect to the FDA's review of what an ANDA applicant claims in its proposed labeling. Though the FDA lacks patent law expertise, it does have drug labeling expertise. Indeed, the Hatch–Waxman Amendments require that the FDA apply that labeling expertise. The FDA must review the proposed labeling submitted with an ANDA to assure that it is the "same as the labeling

approved for the [pioneer drug]," excepting FDA-approved changes. *See* § 355(j)(2)(A)(v); *see also SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 211 F.3d 21, (2d Cir.2000)(finding that necessity of FDA review of ANDA label to assure label is "same as" pioneer label precludes copyright claims over the drug label by the pioneer). Accordingly, the FDA's interpretation of its role in the certification process with respect to method of use patents is permissible given the language and purposes of the Hatch–Waxman Amendments, including the "division of labor" between the FDA and drug applicants that informs the statute. The FDA may refuse to accept an ANDA applicant's paragraph IV certification to a method of use patent when the FDA's independent review of the proposed labeling leads it to conclude the applicant does not seek approval for the use claimed by the patent.

Furthermore, not only did the FDA permissibly interpret its role in assessing the uses claimed by proposed labeling under the statute, but the FDA also permissibly interpreted that statute as precluding an applicant from winning exclusivity based upon a paragraph IV certification on a patent for which a section viii statement was required. The legislative history of Hatch–Waxman supports the FDA's interpretation. House Report No. 98–857(I) notes the circumstances in which a paragraph IV certification rather than a section viii statement must be filed:

> With respect to all product patents which claim the listed drug and all use patents which claim an indication for the drug for which the applicant is seeking approval (hereafter described as a controlling use patent), the applicant must certify, in his opinion and to the best of his knowledge, as to one of four circumstances.

. . .

[I]f there are indications which are claimed by any use patents and for which the applicant is not seeking approval, then an ANDA must state that the applicant is not seeking approval for those indications which are claimed by such use patents.

H.R.Rep. No. 98–857(I), at 22 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2655. As the Federal Circuit recently noted, these excerpts from the House Reports demonstrate "that Congress recognized that a single drug could have more than one indication and yet the ANDA applicant could seek approval for less than all of those indications." *Warner–Lambert v. Apotex,* 316 F.3d 1348, 1359–60 (Fed.Cir. 2003). Indeed, relying in part on this legislative history, the court in *Warner–Lambert* held that Warner–Lambert could not sue Apotex for patent infringement under § 271(e)(2) despite Apotex's filing a paragraph IV certification on a Orange Book-listed method of use patent because Apotex did not seek approval for the use claimed by the patent on which it had filed the certification. Apotex's paragraph IV certification on a method of use patent claiming a use for which it did not seek approval "was effectively a statement of non-applicable use pursuant to 21 U.S.C. § 355(j)(2)(A)(viii)." *Id.* at 1360.

The interpretative issue, of course, is different here in that the Court is not assessing whether Astra may sue Reddy based upon its paragraph IV certifications to the therapy patents. But the House Report and reasoning employed by the Federal Circuit support the FDA's interpretation nonetheless. The FDA interprets the statute to preclude ANDA applicants from filing paragraph IV certifications, and demanding exclusivity on that basis, on method of use patents claiming a use for which the applicant

does not seek approval. Congress clearly recognized the distinction reflected in the regulation between paragraph IV certifications and section viii statements; and the FDA's interpreting the statute to permit it to police that distinction during the ANDA review, especially when it reviews drug labels, is permissible.

For these reasons, the FDA's interpretation of the statute explained in its May, 2002 decision is permissible.

### 3. The FDA's Application of Regulation to Reddy's ANDA

Finally, Reddy argues that even if the regulations are permissible and the FDA is correct that an ANDA applicant is not eligible for exclusivity based upon a paragraph IV certification filed on a patent claiming a use for which the applicant does not seek approval, the FDA wrongly concluded that Reddy did not seek approval for the use claimed by the method of use patents. Although no references to combination therapy or the use of omeprazole for treating H. pylori associated duodenal ulcer appear on Reddy's proposed labeling, Reddy argues that its label did, in fact, cover the indications claimed by the therapy patents and thus its paragraph IV certifications were appropriate (Reddy Brief of July 22, 2002).

With this argument, Reddy challenges the FDA's "informal adjudication" of its ANDA. *See American Bioscience,* 269 F.3d at 1084 (describing informal adjudications as agency actions that are neither the product of formal adjudication nor a rulemaking). Accordingly, the Court reviews the FDA's May, 2002 decision to determine whether that decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and the focal point of the Court's review is the administrative record. 5 U.S.C. § 706(2)(A); *Camp v. Pitts,* 411 U.S. 138,

142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Montgomery Nat. Bank v. Clarke,* 882 F.2d 87, 90 (3d Cir.1989)(applying standard to review Comptroller's adjudication of branch application). The evidence in the administrative record relied upon by the FDA in reaching its decision belies Reddy's contention and fully supports the FDA's decision.

First, the label itself supports the FDA's decision. Absent from it is any mention of the uses claimed by the therapy patents. The Prilosec® label identifies two indications that maybe treated with omeprazole, short term treatment of duodenal ulcer and treatment of H. pylori infection and duodenal ulcer:

### INDICATIONS AND USAGE

*Duodenal Ulcer*

[1]PRILOSEC Delayed–Release Capsules are indicated for short-term treatment of active duodenal ulcer. Most patients heal within four weeks. Some patients may require an additional four weeks of therapy.

[2]PRILOSEC Delayed–Release Capsules, in combination with clarithromycin, are also indicated for treatment of patients with H. Pylori infection and active duodenal ulcer to eradicate H. Pyrloi. Eradication of H. Pylori duodenal ulcer has been shown to reduce the risk of duodenal ulcer recurrence.

(A.R. 84 at 11)(numerals added). The second indication is treated by using omeprazole in combination with clarithromycin, as the label states. This second indication is an indication covered by at least two of the three therapy patents('794, '305) and is the only indication on the label noting the use of omeprazole to treat H. pylori associated duodenal ulcer. (A.R. 4, 4/23/1999 Letter to FDA from Reddy, Attachment—*Astra*

*v. Cheminor Drugs,* (D.N.J.): Complaint, ¶¶ 49, 58, 67.)

Reddy's label, however, identifies only the first indication, "short-term treatment of active duodenal ulcer." Reddy argues that while it left out any mention of combination therapy or H. pylori, its label still indicates a use claimed by the therapy patents because the Reddy label is simply a general statement of the use of omeprazole to treat duodenal ulcer. According to Reddy, the use codes for the therapy patents—the informal descriptions of the method of use patents provided by the innovator when it lists the patents in the Orange Book—claim that the therapy patents cover "treatment of H. pylori associated duodenal ulcer" with omeprazole.[11] (A.R. 90 at 2.) Therefore, when Reddy proposed labeling indicating use of its product to treat "duodenal ulcer" using language identical to the first indication identified on the Prilosec® label, Reddy's label actually included the second indication or some other use claimed by one of the therapy patents as well because the general phrase "duodenal ulcer" encompasses the narrower phrase "H. pylori associated duodenal ulcer."

But there is no evidence in the record corroborating Reddy's professed preference for generality in generic drug labeling. Instead, the record evidence supports the FDA's decision. In addition to the label itself, Reddy's own representations to the FDA and Astra, here the patent owner and innovator, support the FDA's decision. When FDA labeling reviewers noticed that Reddy had omitted from its label the indication covered by the therapy patents (as described in the use codes), treatment of H. pylori associated duodenal ulcer, the FDA asked Reddy to explain why it had filed a paragraph IV certification on the therapy patents. Reddy's response: Red-

---

11. See www.fda.gov/cder/orange/patex.htm for a listing of the FDA's "use codes."

dy would not infringe the use patent because it did not include "the covered indication" in its proposed labeling; therefore, a paragraph IV certification that the therapy patents would not be infringed was appropriate. (A.R. 85, Record of Telephone Conversation with Reddy (11/8/99).)

Similarly, in its statutorily required notice to Astra of its paragraph IV certifications on the therapy patents, Reddy informed Astra that the therapy patents are not infringed because Reddy did not specify any indications in its label requiring the use of omeprazole in combination with clarithromycin or any antimicrobial use, the uses claimed by the therapy patents. (A.R. 4, Complaint, ¶¶ 49, 58, 67.) These representations constitute evidence that Reddy did not label for the uses of omeprazole claimed by the therapy patents, and the FDA was entitled to treat them as such.

When the FDA denied Reddy exclusivity based upon the therapy patents in its May, 2002 decision, it had before it a label submitted by Reddy that the FDA's label examiners thought excluded the use claimed by the therapy patents and Reddy's own statements that its label excluded those indications. With this evidence in the record, the FDA's decision that Reddy had to file a section viii statement instead of a paragraph IV certification for the therapy patents was not arbitrary and capricious.

## V. Conclusion

For the forgoing reasons, Reddy's motion for summary judgment is denied. Instead, summary judgment is granted in favor of the FDA on all claims. All claims against Andrx are dismissed because no relief is sought from that defendant.